MICHAEL BAKWIN *vs.* ROBERT M. MARDIROSIAN & others.[1]

Barnstable. December 3, 2013. - April 2, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Uniform Fraudulent Transfer Act. Judgment. Practice, Civil,* Judgment.

In a civil action alleging, inter alia, claims under the Uniform Fraudulent Transfer Act, G. L. c. 109A, the judge properly ordered that a transfer from the defendant to his wife of his interest in their marital residence be avoided and that the house be restored to its pretransfer status with title held by the defendant and his wife as tenants by the entirety, and further that the defendant's interest in the house be subject to attachment by the plaintiff in satisfaction of a money judgment against the defendant, where the statute commits the form of a judgment to the discretion of the trial judge, and the judge here made a reasoned weighing of the equities that was contemplated by the statute and supported by the record; and where Massachusetts has a strong public policy to protect the interest of non-debtor spouses in a tenancy by the entirety. [635-639]

In a civil action alleging, inter alia, claims under the Uniform Fraudulent Transfer Act, G. L. c. 109A, the judge did not abuse his discretion in imposing an equitable remedy permitting the plaintiff to reach the defendant's one-half interest in a savings account held in his name and in his wife's [639-643]; however, where judgment should not have entered against the wife with respect to that account because the defendant had made no transfer to her under the statute, this court remanded the case for entry of a judgment permitting the plaintiff to recover from the defendant, rather than the wife [643-644].

In a civil action alleging, inter alia, claims under the Uniform Fraudulent Transfer Act, G. L. c. 109A, the judge did not err in ordering entry of judgment, against the trustee of a trust into which the defendant's wife had transferred the contents of a brokerage account after the defendant had transferred to her title in that account (which he had previously owned with her as joint tenants), in an amount representing one-half the value of the brokerage account on the date of the defendant's original transfer to the wife, subject to proportional changes due to market activities in the value of the account from the date of the original transfer to the date of judgment, where the judgment protected the wife's original one-half interest in the brokerage account, which was not the subject of a fraudulent transfer and likely would not have been reachable by a creditor of her husband in any event. [644-648]

---

[1]Madeline M. Mardirosian; David J. Barber, individually and as trustee of the MMM Family Trust; Andrea Barber; and David Mardirosian, individually and as trustee of the Mardirosian Riverside Trust.

In a civil action alleging, inter alia, claims under the Uniform Fraudulent Transfer Act, G. L. c. 109A, the judge erred in concluding that no remedy was available to the plaintiff regarding the fraudulent transfer of the defendant's interest in a trust, where entry of a money judgment was available against the transferee, who did not take in good faith and for reasonably equivalent value, subject to adjustment as the equities might require. [648-652]

CIVIL ACTION commenced in the Superior Court Department on February 13, 2007.

The case was tried before *Christopher A. Muse,* J., and a motion for entry of judgment was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Thomas J. Carey, Jr.* (*Michael A. Collora* with him) for the plaintiff.

*Cynthia B. Hartman* for the defendants.

SPINA, J. The plaintiff in the civil action below, having prevailed on the merits of his claims in Superior Court, appealed the form of the judgment ordered by the trial judge with respect to the remedies granted against certain relief defendants[2] pursuant to the plaintiff's claims under the Uniform Fraudulent Transfer Act (UFTA), G. L. c. 109A. We granted the plaintiff's application for direct appellate review, and we affirm in part and reverse in part.

1. *Background.* This case arises out of a thirty-year-old art theft in Berkshire County and the plaintiff's eventual recovery of seven stolen paintings from the defendant, Robert M. Mardiro-

_____

[2]The term "relief defendant" has been employed by Federal courts in cases involving civil securities law enforcement actions. See, e.g., *Securities & Exch. Comm'n* v. *Cavanagh,* 155 F.3d 129, 136 (2d Cir. 1998); *Securities & Exch. Comm'n* v. *Colello,* 139 F.3d 674, 677 (9th Cir. 1998). It is used to refer to "innocent persons" who have received "ill-gotten funds" and have no legitimate claim to those funds. *Cavanagh, supra.* So-called "relief defendants" may be added to an action so that the plaintiff may obtain equitable relief that serves to disgorge the relief defendants of funds transferred to them for an improper purpose. See, e.g., *Federal Trade Comm'n* v. *Think Achievement Corp.,* 144 F. Supp. 2d 1013, 1020 (N.D. Ind. 2000), aff'd, 312 F.3d 259 (7th Cir. 2002). Because this is the term used by the parties throughout this litigation in reference to certain defendants, and because it accurately represents the nature of the plaintiff's claims against those defendants, we employ the term in this opinion.

sian, a Massachusetts attorney who had represented the suspected thief, David Colvin, prior to Colvin's death in 1979.[3] The facts surrounding the defendant's botched attempts to profit from having found the paintings, and the circuitous path to their recovery, from Stockbridge, to London, to Geneva, and eventually back to the plaintiff, are set forth in detail in *United States* v. *Mardirosian*, 602 F.3d 1, 4, 5, 6 (1st Cir.), cert. denied, 131 S. Ct. 287 (2010). Suffice it to say, Robert Mardirosian was convicted by a jury in Federal court of one count of possessing, concealing, or storing the stolen paintings in violation of 18 U.S.C. § 2315 (2006). *Id.* at 4. The United States Court of Appeals for the First Circuit affirmed both his conviction and his sentence of seven years in prison and three years of supervised release. *Id.* at 4, 6-7. Mardirosian also was ordered to pay a $100,000 fine and to return the paintings still in his possession. *Id.* at 7.

The case before us arises not from this criminal prosecution, but from civil claims brought by the victim of the theft, Michael Bakwin, against Mardirosian in Superior Court while the criminal proceedings against Mardirosian were pending. Bakwin sued Mardirosian for fraud and conversion in order to recoup over $3.4 million he had spent in his efforts to recover the stolen paintings.[4] Bakwin also brought claims under the UFTA as a result of several transfers of assets by Mardirosian to his family members in the weeks and months following the

[3]Robert Mardirosian had represented David Colvin in an unrelated criminal case following the theft of the paintings in 1978. *United States* v. *Mardirosian*, 602 F.3d 1, 4 (1st Cir.), cert. denied, 131 S. Ct. 287 (2010). One night, Mardirosian had permitted Colvin to stay in a loft in an office building Mardirosian owned. *Id.* Following Colvin's shooting death in 1979, Mardirosian discovered the paintings in the loft. *Id.* Mardirosian did not attempt to return them to the owner. *Id.* Rather, he began to research how he might profit from the discovery. *Id.*

[4]The bulk of these costs was comprised of fees Bakwin paid to a London-based company, Art Loss Register (ALR), which assists in the retrieval of stolen art. ALR's fees were based on their expenses as well as a percentage of the value of any art recovered. When ALR recovered the first of the seven stolen paintings, a work by Cézanne, the painting was worth approximately $28 million. Bakwin sold the painting because he did not have the resources to pay ALR's fee and other expenses, which amounted to $2.6 million for the Cézanne. Bakwin later incurred additional costs associated with recovering four of the other paintings.

revelation of his identity as the holder of the stolen paintings.[5] Bakwin also brought claims for relief under the UFTA against those family members whom he alleged had received the fraudulent transfers.

Following a six-day jury trial on the civil claims, the jury returned a special verdict finding Robert Mardirosian liable for conversion and awarding more than $3 million in damages to Bakwin. The jury further found that Robert Mardirosian had made seven transfers that were fraudulent within the meaning of the UFTA. See G. L. c. 109A, §§ 5 (a), 6 (a). After two lengthy hearings on the form of the judgment to be entered on the jury's verdict against Robert[6] as well as his family members, judgment was entered against Robert for a sum totaling over $4.3 million in damages, interest, and costs. Additionally, the judge ordered various equitable remedies against the relief defendants for the purposes of identifying specific assets that had been fraudulently conveyed and could be subject to attachment or reconveyance in satisfaction of the judgment against Robert. Finally, the judge dismissed the claim against one of the relief defendants, David Mardirosian, concerning assets in a shared trust because all the funds in the trust had been dissipated.

Bakwin appeals the form of the judgment entered against the relief defendants on the grounds that money judgments should have been ordered against each of them rather than the equitable remedy of reconveyance, or in the case of the trust funds

---

[5]Under the Uniform Fraudulent Transfer Act (UFTA), G. L. c. 109A, a transfer by a debtor may be fraudulent as to a creditor if, among other things, the debtor made the transfer without receiving reasonably equivalent value and the debtor believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due. G. L. c. 109A, § 5. *In re Rowanoak Corp.*, 344 F.3d 126, 130 (1st Cir. 2003) (applying G. L. c. 109A). Further, a creditor may obtain relief against the recipient of a fraudulent transfer if the recipient did not take in good faith or for value. G. L. c. 109A, § 9. Consequently, once Bakwin became aware of Mardirosian's identity as the possessor of the stolen paintings, Mardirosian reasonably should have believed that Bakwin would become his creditor. Additionally, the revelation of Mardirosian's identity to the general public put his family members on notice that he may incur debts beyond his ability to pay and that transfers of assets to them may be fraudulent as to Bakwin.

[6]With the introduction of multiple family members with the same last name, we hereafter will refer to members of the Mardirosian family by their first names.

transferred to David Mardirosian, dismissal of the claim.[7] We describe in greater detail the relevant transfers, the judgment ordered with respect to each transfer, and our conclusions regarding each of the judgments in turn.

2. *The Falmouth residence.* On March 13, 2006, soon after Robert had been revealed publicly as holder of the stolen paintings, Robert and his wife, Madeline, together executed a deed transferring title of their home in Falmouth to Madeline's name alone. Robert and Madeline had purchased the home in 2004 for $1.05 million and taken title as tenants by the entirety. The March, 2006, transfer to Madeline was made for only nominal consideration. The jury found that this constituted a fraudulent transfer of Robert's one-half interest in the home, and the jury valued his interest at $531,300. Consequently, as equitable relief from this fraudulent transfer, the judge ordered that the transfer be avoided and that the house be restored to its pretransfer status with title held by both Robert and Madeline as tenants by the entirety. The judge further ordered that Robert's interest in the home be subject to attachment by Bakwin in satisfaction of the money judgment against Robert. Bakwin appeals the form of this judgment, arguing that the judge erred in ordering a reconveyance of the property rather than a money judgment against Madeline. We conclude that the form of the judgment ordered by the judge as to the Falmouth residence was not error.

The UFTA provides several equitable remedies for creditors, including avoidance of a fraudulent transfer to the extent necessary to satisfy a creditor's claim. G. L. c. 109A, § 8 (*a*). Additionally, to the extent a transfer is voidable under § 8 (*a*) (1) of the statute, a creditor may recover a money judgment against the recipient of the fraudulently transferred asset, subject to adjustment of the value "as the equities may require." G. L. c. 109A, § 9 (*b*), (*c*).

Bakwin argues that the judge erred by ordering a judgment

---

[7]Bakwin does not appeal the money judgments that were ordered against relief defendants who received cash transfers, specifically the entry of a $30,000 money judgment against Andrea and David Barber (Robert's daughter and son-in-law) and the entry of a $15,000 money judgment against David Mardirosian (Robert's son).

providing for avoidance of the transfer and attachment of Robert's interest, rather than a money judgment against Madeline. Specifically, Bakwin argues that restoring the title to a tenancy by the entirety may have the effect Robert desired, of placing the Falmouth home out of reach of Bakwin as a judgment creditor, which would in turn frustrate the purposes of the UFTA. Such a result could occur because Massachusetts law protects nondebtor spouses who hold property in a tenancy by the entirety. G. L. c. 209, § 1. Although the debtor spouse's interest in the tenancy by the entirety may be attached, the nondebtor spouse is protected from execution against that property during his or her lifetime, so long as the property is his or her principal residence (and in certain other circumstances not applicable here). *Id. Peebles* v. *Minnis*, 402 Mass. 282, 283 (1988). Additionally, each holder of a tenancy by the entirety has an indestructible right of survivorship. Should the debtor spouse die first, the debtor's attached interest is extinguished and the nondebtor spouse will take the property free of the creditor's attachment. *Coraccio* v. *Lowell Five Cents Sav. Bank*, 415 Mass. 145, 151 (1993). Therefore, according to Bakwin's argument, reconveyance of the property to a tenancy by the entirety may undermine the UFTA's goal of assisting creditors in reaching assets of debtors in satisfaction of their debts in the event that Robert predeceases Madeline and she takes title free of the attachment of Robert's interest.

Additionally, Bakwin argues that reconveyance of the property weighs against equitable principles and public policy because reconveyance benefits Robert and Madeline and "equity will not aid a wrongdoer." Specifically, Bakwin argues that Robert and Madeline voluntarily severed their tenancy by the entirety through their transfer of the Falmouth property to Madeline alone. Therefore, they relinquished the protections afforded to the nondebtor spouse in a tenancy by the entirety and should not receive the benefit of a reconveyance of the property to its pretransfer status. Bakwin also contends that by failing to order a money judgment against Madeline, the judge denied Bakwin creditor status as to Madeline and thereby prevented him from executing on the judgment against the Falmouth home, which in turn deprived him of his statutory remedy and frustrated the

purposes of the UFTA. See *In re Edmonston*, 107 F.3d 74, 75 (1st Cir. 1997) (creditor of both spouses may reach and apply joint tenancy property).

None of these arguments is availing. The UFTA, by its terms, provides for a range of possible remedies and forms of judgment to be entered against a fraudulent transferor or transferee in order to aid a creditor in obtaining repayment of a debt. G. L. c. 109A, § 8. None of these remedies is mandatory, and the statute commits the form of the judgment to the discretion of the trial judge. G. L. c. 109A, § 8 (*a*). *Rivera* v. *Club Caravan, Inc.*, 77 Mass. App. Ct. 17, 26-27 (2010). Furthermore, the statute expressly calls for its provisions to be supplemented by the "principles of law and equity." G. L. c. 109A, § 11. The UFTA, like its predecessor, the Uniform Fraudulent Conveyance Act, provides a means by which a creditor may avoid transfers intended to frustrate the creditor's claims. G. L. c. 109A, § 8. *Jorden* v. *Ball*, 357 Mass. 468, 470 (1970). The statute does not create new claims, nor does it contemplate placing the creditor in a more favorable position than would have existed without the fraudulent transfer. See *Jorden*, *supra*. The remedies set forth in the UFTA assist a creditor in restoring the debtor's assets to their pretransfer status in order to enable the creditor to reach those assets that would have been available to satisfy the judgment but for the debtor's fraudulent transfer. See 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 116 (2013).

Indeed, other jurisdictions that have adopted and applied the UFTA have held that money damages are generally an appropriate form of judgment against a transferee only when the transferee has disposed of the asset transferred. See *United States* v. *Verduchi*, 434 F.3d 17, 22-23 (1st Cir. 2006) (applying Rhode Island law); *Robinson* v. *Coughlin*, 266 Conn. 1, 9 (2003). See also *Yankee Microwave, Inc.* v. *Petricca Communications Sys., Inc.*, 53 Mass. App. Ct. 497, 516 (2002) (where Massachusetts law is silent, it is appropriate to look to other jurisdictions' interpretations of analogous statutory provisions).

Equity generally regards as done that which ought to be done. *Matter of Bergman*, 585 F.2d 1171, 1177 (2d Cir. 1978). In this case, if Robert never had transferred his interest in the Falmouth residence to Madeline, the two would have continued to

hold the property as tenants by the entirety and the best Bakwin could have hoped for was what he received here: an attachment of Robert's one-half interest in the property he held with Madeline as a tenancy by the entirety, subject to Madeline's indestructible right of survivorship. See *Innis* v. *Robertson*, 67 Mass. App. Ct. 388, 392 (2006).

Furthermore, although Bakwin argues that Robert and Madeline voluntarily severed their tenancy by the entirety by deed, the jury were not asked to, and did not find, that Madeline shared Robert's intent to defraud his creditors when she received the transfer.[8] Madeline therefore represents an "innocent" nondebtor spouse. Massachusetts has always had a strong public policy of protecting the interests of nondebtor spouses, especially in the context of property held as a tenancy by the entirety that is a nondebtor spouse's primary residence. See G. L. c. 209, § 1; *Peebles*, 402 Mass. at 283; *Innis*, 67 Mass. App. Ct. at 392. Therefore, the judge made a reasoned weighing of the equities, supported by the record and as contemplated by the UFTA.

Finally, we acknowledge that some Federal courts interpreting other States' fraudulent transfer acts in light of the Federal Bankruptcy Code have declined to restore fraudulently transferred property to its pretransfer status. See, e.g., *In re Young*, 238 B.R. 112, 115-116 (B.A.P. 6th Cir. 1999). We also acknowledge that in certain circumstances, case law interpreting the Federal Bankruptcy Code may be instructive in interpreting the UFTA because certain provisions of the UFTA were drawn from the Federal Bankruptcy Code or drafted so as to comport with it. Compare 11 U.S.C. § 548(d)(2)(A) (2006) with G. L. c. 109A, § 4 (*a*), and compare 11 U.S.C § 550 (2006) with G. L. c. 109A, § 9. See Prefatory Note to UFTA, 7A (Part II) U.L.A. 4 (Master ed. 2006) (identifying changes to Federal Bankruptcy Code under Federal Bankruptcy Reform Act of 1978 as one reason for replacing Uniform Fraudulent Conveyance Act with UFTA). See also *Yankee Microwave, Inc.*, 53 Mass. App. Ct. at 516. However, we do not find the rationale of case law declining

---

[8]Indeed, the judge stated during the hearings on the form of judgment that Bakwin's theory of the case had been that Robert alone possessed the fraudulent intent to shield his assets from Bakwin.

to reconvey fraudulently transferred property in the bankruptcy context persuasive on this point.

First, the rationale is based in part on the text of the Federal Bankruptcy Code, which is not relevant in a case based purely on State fraudulent transfer law. See, e.g., *Tavenner* v. *Smoot*, 257 F.3d 401, 406-407 (4th Cir. 2001), cert. denied, 534 U.S. 1116 (2002); *In re Swiontek*, 376 B.R. 851, 861, 863-864 (Bankr. N.D. Ill. 2007). Additionally, the position taken by some Federal courts in declining to restore the pretransfer status of fraudulently transferred property that would have been exempt from the bankruptcy estate had the property remained in the debtor's possession is that creditors are harmed by the transfer because the exemption of the property is not a certainty. See, e.g., *Tavenner, supra* at 407; *In re O'Brien*, 443 B.R. 117, 133 (Bankr. W.D. Mich. 2011); *Matter of Wickstrom*, 113 B.R. 339, 347-348 (Bankr. W.D. Mich. 1990). To exempt eligible property from the bankruptcy estate, debtors in bankruptcy must assert affirmatively the exemption; otherwise the exemption is lost. *Tavenner, supra*. Exemptions are a right that belongs to the debtor, not an inherent feature of the property. *In re Noblit*, 72 F.3d 757, 758 (9th Cir. 1995). *In re O'Brien, supra*. However, as stated *supra*, when property in Massachusetts is held as a tenancy by the entirety, the property is not subject to seizure and execution by creditors of only one spouse so long as the property remains the primary residence of the nondebtor spouse (and in certain other circumstances not applicable here). G. L. c. 209, § 1. *Peebles*, 402 Mass. at 283. This is a protection inherent in a tenancy by the entirety, not merely a protection that is triggered only if raised. Therefore, in a case such as this, which is based purely on State law, we conclude that in light of our State's strong public policy to protect the interest of non-debtor spouses in a tenancy by the entirety, the judge did not abuse his discretion in ordering the equitable remedy of reconveyance of the Mardirosian's marital residence to its pretransfer status.[9]

3. *Citizens Bank certificate of deposit and savings account.*

---

[9]We review the imposition of equitable remedies for an abuse of discretion. *Cavadi* v. *DeYeso*, 458 Mass. 615, 624 (2011). At oral argument, Bakwin argued that we should not apply a deferential standard of review because the

On February 6, 2006, shortly after his identity as the holder of the paintings was made public, Robert withdrew the funds from a three-month certificate of deposit (CD) account held in both Robert's and Madeline's names. At the time the funds were withdrawn, the CD account was worth $572,936. Evidence presented at trial indicated that on the same day the funds were withdrawn from the CD account, $314,170 was transferred into a savings account also held in both Robert's and Madeline's names. Of the remaining portion of the proceeds of the CD, Robert received approximately $10,000 in cash and paid approximately $250,000 to a law firm.

Prior to the deposit of a portion of the proceeds from the CD, the savings account contained a total of $121,798. Therefore, following the deposit of the proceeds from the CD, the savings account held a total of $435,968. Four days later, on February 10, $60,000 was withdrawn from the account. On that same day, Robert and Madeline's daughter, Andrea (Mardirosian) Barber, deposited $60,000 into a bank account held in the name of her husband, David Barber. Subsequently, prior to trial, but almost two years after the funds from the CD had been withdrawn and a portion of the proceeds transferred to the savings account, Bakwin obtained a trustee attachment on the savings account. The amount reported in the trustee's answer as present in the account at the time of attachment was $339,599.

Based on these facts, the jury found that Robert fraudulently had transferred to Madeline his one-half interest in the CD in

---

trial judge was not aware that he had discretion under G. L. c. 109A, § 8 (*a*), to impose a remedy other than reconveyance of the Falmouth residence to a tenancy by the entirety. In support of this argument, Bakwin referenced the judge's statement during the hearing on the judgment that "the law is on my side on that," which, Bakwin asserts, demonstrated the judge's belief that he was obligated to reconvey the property as a matter of law. We disagree with this interpretation of the judge's reasoning. In his memorandum of decision, the judge stated that "[e]quity requires that the Mardirosian's primary residence be reconveyed to its former status as a tenancy by the entirety." The judge recognized that the UFTA provides for the application of remedies according to principles of equity. G. L. c. 109A, §§ 9 (*b*), (*c*), 11. The judge also based his determination on the public policy of protecting the interest of a nondebtor spouse in a tenancy by the entirety, and the general equitable principle that the UFTA is not intended to provide a windfall to the creditor. This was a sound weighing of the equities based on the specific facts of this case, and there is no indication that the judge was not aware that he had discretion in the matter.

the amount of $286,468, which represents one-half of the total value of the CD prior to the withdrawal of the funds. The jury also found that Robert fraudulently had transferred to Madeline his one-half interest in their joint savings account in the amount of $60,899, which represents one-half of the total amount shown to be in the savings account prior to the deposit of the proceeds from the CD. The jury also found that Robert fraudulently had transferred $30,000 to David and Andrea Barber.[10]

The judge accepted all these findings and ordered a judgment against Madeline requiring her to remit Robert's one-half interest in the savings account. Bakwin appeals the form of the judgment entered on the savings account on the basis that the judgment requires Madeline to remit at most one-half of the amount in the account at the time of the trustee attachment, yet the jury found that Robert transferred to Madeline his one-half interest in the CD and his one-half interest in the savings account totaling $347,367. Bakwin contends that the UFTA entitles him to a money judgment against Madeline for the value of the assets transferred at the time they were transferred to her, such that the judge should have ordered a money judgment against Madeline for $347,367. We conclude that the judgment with respect to the portion of the savings account available to Bakwin was proper. However, we also conclude that judgment must enter not against Madeline, but against Robert.

Although the UFTA does permit money judgments against fraudulent transferees, such judgments are only one available remedy. G. L. c. 109A, §§ 8, 9. The statute makes a full range of equitable remedies available to plaintiffs and commits the

---

[10]Following trial, the relief defendants David and Andrea Barber challenged this verdict in a motion for judgment notwithstanding the verdict on the basis that the jury's finding was not supported by the evidence and represented an impermissible "compromise verdict." See *Simmons* v. *Fish*, 210 Mass. 563, 570 (1912) (jury shall seek to "harmonize their views" but not to "compromise, divide and yield for the mere purpose of an agreement"). The Barbers argued that although the evidence could have been construed to show a transfer of $60,000 to the Barbers, it could not have been construed to show a transfer of the lesser amount of $30,000, and therefore fewer than ten jurors had likely been persuaded that Robert made a fraudulent transfer to the Barbers. The judge denied the motion and, based on this verdict, ordered a money judgment against David and Andrea Barber for $30,000. Bakwin does not appeal this judgment.

form of remedy to the sound discretion of a trial judge. G. L. c. 109A, § 8. *Rivera*, 77 Mass. App. Ct. at 27. Consequently, the judge had discretion to impose an equitable remedy permitting the plaintiff to reach Robert's one-half interest in the account, rather than ordering a money judgment against Madeline. See *Cavadi* v. *DeYeso*, 458 Mass. 615, 624 (2011). The judge did not abuse that discretion.

In limiting relief to one-half of the value of the savings account, the judge recognized Madeline's one-half interest in both the CD and the savings account. The law regarding joint accounts in Massachusetts is well settled. See *Astravas* v. *Petronis*, 361 Mass. 366, 370 (1972); *DePasqua* v. *Bergstedt*, 355 Mass. 734, 736 (1969); *Desrosiers* v. *Germain*, 12 Mass. App. Ct. 852, 855 (1981). A contract of deposit is conclusive as between the bank and other parties to the account, but as between account holders or between account holders and other interested parties, the respective interests are a question of fact. *DePasqua, supra.* A transaction creating a joint account is to be taken at face value unless evidence is presented to show that the account holders intended an arrangement other than joint ownership. See *Doucette* v. *Doucette*, 361 Mass. 156, 157-58 (1972); *DePasqua, supra*; *Buckley* v. *Buckley*, 301 Mass. 530, 531 (1938). Additionally, a rebuttable presumption exists that money or other property delivered by one spouse to another is intended as a gift. *Doucette, supra*, citing *Powell* v. *Powell*, 260 Mass. 505, 508 (1927).

Evidence presented at trial indicated that at all relevant times, both the CD and the savings account were held in both Robert's and Madeline's names. Although Madeline testified at trial that the money used to purchase the CD was Robert's and that he controlled the account, this testimony alone is not enough to rebut the presumption that by opening the account in both his and Madeline's names, Robert had the intent to grant Madeline an interest in the account. Furthermore, evidence presented at trial indicated that most all of the couple's other property, including their previous and current marital residences, as well as the savings account and a brokerage account held by Citizens Investment Services, was owned jointly by both Robert and Madeline and that the couple's financial resources were used and enjoyed by both of them.

Additionally, at the time the savings account was attached, the statute governing trustee attachments expressly provided that joint accounts were to be treated as if each account holder owned one-half of the account. G. L. c. 246, § 28A, as amended by St. 1975, c. 377, § 133. Therefore, had Madeline asserted her rights to one-half of the savings account following the attachment of the savings account by trustee process, she likely would have established successfully that one-half of the account was hers and is not reachable by creditors of her husband alone. See *Laubinger* v. *Department of Revenue*, 41 Mass. App. Ct. 598, 602 (1996) ("A joint owner has the right to show the extent of his or her real interest"). See also *Minihan* v. *Commissioner of Internal Revenue*, 138 T.C. 1, 17 (2012), amended on reconsideration by U.S. Tax Ct., No. 26595-09 (Feb. 17, 2012) (although attachment of joint accounts is authorized by Massachusetts law, joint account holders have right to assert their ownership interest in account).

Further, at trial, the plaintiff emphasized that he did not seek to reach any assets that rightfully belonged to the relief defendants prior to Robert's fraudulent transfers to them. Therefore, the judge acted within his discretion in fashioning an equitable remedy that protected Madeline's one-half interest in the CD and the savings account prior to any of the transfers at issue.

Although we agree that Bakwin is entitled to reach only one-half of the amount in the savings account at the time of the trustee attachment, we do not agree that judgment should enter against Madeline with respect to this account. The jury's finding that Robert fraudulently transferred his original one-half interest in the joint savings account to Madeline, valued at $60,899, is not supported by the evidence and is contrary to law.

Under the UFTA, a transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." G. L. c. 109A, § 2. No evidence was presented to the jury that Robert withdrew his one-half of the savings account, relinquished control of it, or changed title in the account at any point between Bakwin discovering his

identity in 2006 and the attachment of the savings account in 2007. Consequently, the proceeds of the CD that were deposited into the joint savings account at all relevant times also retained their character as an asset jointly held by Robert and Madeline. Where Robert's right to the proceeds of the CD or the savings account never changed, no transfer was made under the UFTA. G. L. c. 109A, § 2. Madeline cannot be considered a "transferee" under the UFTA, and judgment cannot be entered against her as being the recipient of Robert's original one-half interest in the savings account or the CD.[11]

We therefore remand this case for entry of a judgment permitting Bakwin to recover from Robert, rather than Madeline, Robert's one-half interest in the savings account. This does not change the amount of the judgment ordered by the trial judge with respect to the savings account, only the form of the judgment. This judgment will then permit Bakwin to make a motion to charge the trustee for one-half of the contents of the savings account based on the value of the account at the time of attachment. *Arthur D. Little, Inc.* v. *East Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 738-739 (1994). Thereafter, the trustee shall be discharged, and Madeline shall be entitled to the remainder of the account. Our holding here effectuates the jury's verdict to the extent that it may be construed as identifying one-half of the savings account and the CD as assets Bakwin should be able to obtain in satisfying the judgment against Robert, and it affirms the purpose of the judgment ordered by the trial judge with respect to the savings account, in that it preserves Madeline's one-half interest in this jointly held asset.

4. *Citizens Investment Services brokerage account.* In March, 2006, approximately one month after Robert's possession of the paintings was revealed publicly, Robert transferred title in a Citizens Investment Services account (brokerage account), which he and Madeline had owned as joint tenants, to Madeline's name alone. Robert and Madeline had opened the account with proceeds from the sale of their previous residence, a home they

---

[11]We acknowledge that no party challenged either the characterization of the actions undertaken regarding these accounts as "transfers" or the jury's verdict on these issues. Nonetheless, we cannot permit the entry of a judgment against Madeline that is not authorized by statute or justified by the record.

had owned until 2004. Prior to the transfer of the brokerage account to Madeline, the entire account was worth $537,838. Following the transfer, the value of the account appreciated in Madeline's hands. Subsequently, on December 10, 2007, Madeline transferred the contents of the brokerage account to her son-in-law, David Barber, as trustee of the newly created MMM Family Trust. The value of the brokerage account in Madeline's hands immediately prior to the transfer was $703,853. The value of the brokerage account at the time the MMM Family Trust took possession of it was $685,708. Soon thereafter, on January 4, 2008, David Barber ordered $100,000 withdrawn from the brokerage account to be deposited into his client account.[12]

Approximately four months later, in April 2008, Bakwin filed an ex parte motion to attach Robert's one-half interest in the brokerage account. In his motion, Bakwin contended that the value of Robert's interest was $351,926, which is one-half of the value of the brokerage account immediately prior to Madeline's transfer of the account to the MMM Family Trust. The court authorized the attachment by trustee process in the amount of $351,926, also in April, 2008.[13] However, the trustee's answer to the summons was not received until April, 2010. According to the trustee's answer, which reflected a date of service of the summons as April 15, 2010, on that date the total account was worth only $368,911.[14]

Bakwin sued David Barber in his capacity as trustee of the

---

[12]David Barber is an attorney. Based on his testimony and documentary evidence presented at trial, this $100,000 was distributed in large part to David Mardirosian, the son of Robert and Madeline, and to the business David owned at the time, Pasha, Inc.

[13]Although neither Citizens Investment Services nor any of the relief defendants makes issue of this, corporate stock normally is attached prior to judgment by a bill to reach and apply, rather than by trustee process. G. L. c. 214, § 3 (7). *Jordan* v. *Lavin*, 319 Mass. 362, 367 (1946). See G. L. c. 223, § 71. See also G. L. c. 109A, § 8 (*a*) (2) (requiring that any prejudgment equitable remedies obtained under UFTA adhere to procedures set forth in statutes governing those remedies). For the purposes of this case, and for any post-judgment procedures required to execute the judgment, this account shall be treated as validly attached by trustee process. See *Arthur D. Little, Inc.* v. *East Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 738-739 (1994) (describing procedures to charge trustee).

[14]The trustee therefore appears to have answered that the whole account

MMM Family Trust in order to reach the contents of the brokerage account. See G. L. c. 109A, § 9 (b). Although Bakwin originally brought fraudulent transfer claims against both Robert and Madeline, and therefore brought claims against David Barber on the theory that he had received a fraudulent transfer from Madeline, Bakwin pursued a trial strategy of bringing substantive fraudulent transfer claims against Robert alone. Consequently, the jury were not asked to find that Madeline made a fraudulent transfer to David Barber. Rather, the jury were asked to, and did, find that Robert made a fraudulent transfer of his one-half interest in the brokerage account to Madeline. The jury found that the amount of this fraudulent transfer was $268,919, representing one-half the value of the brokerage account on the date of Robert's original transfer to Madeline. The jury also were asked to find whether David Barber, in his capacity as trustee of the MMM Family Trust, received Madeline's transfer of the brokerage account either in good faith or for value. The jury found that he did not.[15]

Based on the jury's verdict, the judge ordered entry of judgment against David Barber as trustee of the MMM Family Trust for $268,919 of the brokerage account, "subject to the proportional changes due to the market activities in the value of the account from [the date of the original transfer from Robert to Madeline] to the date of judgment." Based on the hearings on the form of the judgment, the judge's rationale for fashioning the remedy with the caveat regarding changes in market value appears to have been intended to acknowledge that one-half of the funds in the brokerage account have always belonged to

was subject to attachment. Rule 4.2 (c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 740 (1974), requires that trustee process shall be served within thirty days after the date of the order approving the attachment. The apparent two-year time lapse between the approval of trustee attachment of the brokerage account and the service of summons on the trustee is not accounted for in the record. Because no party raises this issue, we shall treat the service of the summons as valid, but we note that the trustee is only responsible for the amount in its control on the date of service of the summons. See G. L. c. 246, § 10; Mass. R. Civ. P. 4.2 (d), 365 Mass. 740 (1974).

[15]The UFTA permits the avoidance of a transfer in the hands of a subsequent transferee only if the transferee did not take the transfer in good faith and for value. G. L. c. 109A, § 9 (b) (2). Therefore, this finding was necessary to permit the judge to grant relief with respect to the brokerage account now in the possession of the MMM Family Trust and the trustee, David Barber.

Madeline and therefore to protect her one-half interest in the investments. Furthermore, the parties acknowledged at the hearing on the judgment that aside from the $100,000 withdrawal, the diminution in the value of the account was due to a significant downturn in the market in the time period following Madeline's transfer of the account to the MMM Family Trust.

Bakwin appeals this judgment, arguing that the court should have ordered a money judgment against both Madeline and the trust (to be recovered only once).[16] Bakwin argues that a money judgment should have entered against Madeline for one-half of the value of the brokerage account at the time she transferred it to the trust and that judgment should have entered against the trust for at least one-half of the amount of the original fraudulent transfer from Robert to Madeline if not one-half of the amount received from Madeline. Bakwin argues that increases in the value of the account in Madeline's hands as a result of investment income should be added to the recoverable amount, but that any decreases in the value of the account as a result of market losses should not affect his entitlement to recover at least the amount of the original fraudulent transfer from Robert to Madeline.

We conclude that the judgment ordered regarding the brokerage account was not error because it protects Madeline's original one-half interest in the brokerage account, which was not the subject of a fraudulent transfer and likely would not have been reachable by a creditor of her husband in any event. See G. L. c. 246, § 28A, as amended by St. 1975, c. 377, § 133; *Doucette*, 361 Mass. at 157-58; *Laubinger*, 41 Mass. App. Ct. at 602.

The UFTA permits the exercise of discretion by trial judges in selecting equitable remedies and fashioning relief as the

---

[16]The relief defendants imply that Bakwin waived any right to appeal this judgment on the basis that the parties agreed to, and in fact jointly drafted, the specific language of the judgment during the hearing on the form of judgment. We have reviewed the record of the hearings, and it is apparent that by the time the parties proposed this specific language, they did so to assist the judge with the wording of the judgment he intended to order, not because they necessarily agreed that the substance of the judgment was proper. Bakwin repeatedly argued in favor of the entry of a money judgment throughout the hearings, and we treat his rights as preserved on this point.

equities may require. G. L. c. 109A, §§ 8 (*a*) (3), 9 (*c*), 11. The evidence presented at trial demonstrated that Robert and Madeline had opened the brokerage account in both their names, using funds from the sale of their marital residence. Therefore, the judge properly recognized that Madeline likely had a valid claim to one-half of the contents of the account. See *Doucette, supra; Laubinger, supra.* Additionally, in his motion to attach the brokerage account by trustee process, Bakwin only ever sought to attach Robert's one-half interest in the account. Throughout trial, Bakwin also emphasized that he sought only to reach Robert's assets, not those belonging rightfully to his family members. Where Bakwin always accepted that one-half of the account was Madeline's investment, equity requires holding Bakwin to that result. Therefore, a balancing of the equities supports recovery only of Robert's proportional one-half interest in the account.

Furthermore, although case law from other jurisdictions interpreting the UFTA has permitted money judgments to be entered against fraudulent transferees, such judgments typically have been preserved for circumstances in which the asset is no longer available due to the transferees' dissipation of it. See *Verduchi,* 434 F.3d at 22-23; *Robinson,* 266 Conn. at 9.[17] However, the decrease in the value of the brokerage account due to market fluctuations is not the sort of dissipation that should be held against the transferee in the form of a money judgment. Indeed, at all relevant points, the brokerage account remained in the form of investment funds, and it is likely that the value of those funds would have decreased whether the fraudulent transfer had taken place or not. Consequently, the judge properly exercised his discretion in ordering equitable relief requiring that Robert's proportional interest in the brokerage account alone should be turned over to Bakwin.

5. *Mardirosian Riverside Trust.* Prior to 2007, Robert and his son David each held an interest in the Mardirosian Riverside Trust (Riverside Trust). Beginning in the late 1990s or early

---

[17]The withdrawal from the brokerage account subsequent to its transfer to the MMM Family Trust in the amount of $100,000 may constitute dissipation, however, and a money judgment may be warranted against David Mardirosian as a subsequent transferee. G. L. c. 109A, § 9 (*b*) (2).

2000s, the trust corpus consisted of real property located in Falmouth. The property had been purchased by the trust with funds furnished by Robert to serve as a site for a restaurant operated by David. Around 2004, David sold the restaurant located on the property and began to renovate the property to generate rental income. Thereafter, David commenced a new restaurant venture in Providence, Rhode Island. David used the trust property in Falmouth as collateral to secure funds to open the restaurant in Providence.

According to the 2005 and 2006 tax filings of both Robert and David, each held a fifty per cent interest in the Riverside Trust. However, according to David's testimony, his father never asserted any rights over the property, nor did he receive income from the trust or attempt to control the use or disposition of the trust property.

Robert and David's 2007 tax filings evinced a change in ownership of the Riverside Trust, however, listing Robert as owning no interest in the trust and David as owning one hundred per cent. Also during 2007, David sold the property held by the trust. The 2007 tax filings for the trust therefore listed cash distributions from the trust totaling $573,460. The 2007 tax filings indicated that Robert received a distribution from the trust of $138,696 and David received a distribution of $434,764.

According to David's testimony, however, Robert did not receive any of the proceeds of the sale of the Riverside Trust property. Additionally, based on the evidence presented at trial, a portion of the proceeds from the sale of the property was used to pay off one of the mortgages on the property, which David had obtained to generate funds for the restaurant, and the jury were presented with conflicting testimony as to what became of the remainder. Either it was held in escrow by the bank indefinitely, or David transferred the remaining proceeds of the sale to his corporation, Pasha, Inc., which owned and operated his Providence restaurant venture. In any event, there was no evidence that any portion of the proceeds went to Robert or that he received any consideration from David in exchange for his interest in the trust. Additionally, only a portion of the distributions listed on the 2007 tax filings, if any, were actually received by David. Furthermore, the Providence restaurant eventually failed, and Pasha, Inc., declared bankruptcy.

The evidence presented at trial demonstrated that despite his status as a partner with David in the Riverside Trust, Robert permitted David to mortgage and eventually sell the trust property and keep all of the proceeds for himself and his restaurant venture without receiving anything in return. Based on this evidence, the jury concluded that Robert had fraudulently transferred his one-half interest in the trust to David in order to put that asset out of reach of his creditors. Based most likely on 2007 tax filings showing a cash disbursement from the trust totaling $573,460, the jury valued Robert's one-half interest in the trust at $286,730.

At the hearing on the judgment, Bakwin asked that a money judgment be ordered against David as a fraudulent transferee of Robert's one-half interest in the Riverside Trust. The judge reasoned, however, that because David had dissipated all of the trust's assets by investing them in his failed restaurant venture, no interest in the trust remained to be reconveyed to Robert. Therefore, the judge concluded that no remedy was available to Bakwin regarding the fraudulent transfer of the interest in the trust, and the judge ordered that the claim against David as to the trust be dismissed. This judgment was error, and we reverse.[18]

In addition to equitable remedies, the UFTA expressly permits the entry of money judgments against recipients of a fraudulent transfer who do not take in good faith and for reasonably equivalent value. G. L. c. 109A, § 9 (*a*), (*b*). Indeed, other jurisdictions that have adopted the UFTA have concluded that money judgments against fraudulent transferees are particularly warranted in circumstances in which the transferee has dissipated the asset. See *Verduchi*, 434 F.3d at 22-23 (applying Rhode Island law); *Robinson*, 266 Conn. at 9. In *Scholes* v. *Lehman*, 56 F.3d 750, 753, 760, 761, 763 (7th Cir.), cert. denied sub nom. *African Enter., Inc.* v. *Scholes*, 516 U.S. 1028 (1995), the United States Court of Appeals for the Seventh Circuit,

---

[18]Although we review a judge's selection of a remedy under the UFTA for an abuse of discretion, here the judge's determination that no remedy was available appeared to be based on a misapprehension of the UFTA and not an exercise of discretion in selecting the form of the judgment in light of the equities. When a judge concludes that a certain ruling is not within his or her power, when in fact it is discretionary, that is an error of law. *Crenshaw* v. *Macklin*, 430 Mass. 633, 636 (2000).

applying the Illinois Uniform Fraudulent Conveyance Act, but also discussing the Illinois Uniform Fraudulent Transfer Act, which had since taken effect, upheld a money judgment against a group of religious organizations that had accepted donations of fraudulently transferred assets and subsequently spent those donations on charitable works. The court reasoned that to do otherwise would thwart the purposes of the fraudulent conveyance statute and its goal of preserving a debtor's assets for creditors by permitting, perhaps even encouraging, the immediate dissipation of fraudulent transfers by transferees. *Id.* at 761. We are persuaded by this rationale.

Consequently, where entry of a money judgment against David was an available remedy under the UFTA, the judge erred in concluding that the Bakwin's claim against David as a relief defendant must be dismissed. See G. L. c. 109A, § 9 (*b*) (2). Furthermore, because the fraudulently transferred interest in the trust was dissipated by David in furtherance of his restaurant venture, a money judgment is the most appropriate form of relief to be entered on the jury's verdict on this claim. See *Verduchi*, *supra*; *Scholes*, *supra*.

However, G. L. c. 109A, § 9 (*c*), also provides that the value of a money judgment shall be subject to adjustment as the equities may require. Therefore, on remand, the judge may exercise his discretion in determining the precise value of the money judgment. See *Cavadi*, 458 Mass. at 624. In so doing, the judge may consider such facts as Bakwin's emphasis at trial that he was neither pursuing substantive claims of fraud or conversion against David, nor trying to reach assets of Robert's family members that were rightfully theirs. To the extent David's testimony was credible, the judge also may consider David's claims at trial that his father frequently provided him with financial assistance, never asserted any rights or interest in the property held by the Riverside Trust or the trust income prior to the transfers, and that David believed he owned the trust property outright. The judge also may consider that David did not raise any affirmative defenses provided by the UFTA, including under G. L. c. 109A, § 9 (*f*), which provides that a transfer is not voidable if it is made in the ordinary course of business or financial affairs of the debtor and an insider-recipient. Therefore,

we reverse the dismissal of the claims against David Mardiro-
sian as trustee of the Mardirosian Riverside Trust, and we remand
for entry of a money judgment against David based on the
value of Robert's interest at the time of the transfer and subject
to adjustment according to G. L. c. 109A, § 9 (c).

6. *Conclusion.* The judgment with respect to the Falmouth
residence is affirmed. The judgment with respect to the Citizens
Bank savings account is reversed and remanded for entry of
judgment against Robert Mardirosian. The judgment with respect
to the Citizens Investment Services brokerage account is af-
firmed. The judgment against David Mardirosian with respect to
the Mardirosian Riverside Trust is reversed, and the case is
remanded for entry of a money judgment against David Mardiro-
sian in the amount of the value of the asset at the time of transfer
subject to adjustment as the equities may require.

*So ordered.*