# United States Court of Appeals
## For the First Circuit

No. 16-1415

UNITED STATES,
Plaintiff, Appellant,

v.

SCOTT G. BAKER, ROBYN BAKER,
Defendants, Appellees,

ONEWEST BANK, F.S.B.,
Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Norah E. Bringer, Attorney, Tax Division, Department of Justice, with whom Caroline D. Ciraolo, Principal Deputy Assistant Attorney General, Thomas J. Clark, Attorney, Tax Division, and Carmen M. Ortiz, United States Attorney, were on brief, for appellant.

D. Sean McMahon, with whom Eric J. Rietveld and McMahon & Associates, PC were on brief, for appellee Robyn Baker.

March 24, 2017

**TORRUELLA**, **Circuit Judge**.   Scott G. Baker used a tax shelter to reduce his taxable income for the years 1997-2002.  In 2008, he divorced his wife Robyn Baker in order to fraudulently transfer assets and avoid some of his tax liability.[1]  Following an agreed judgment for over five million dollars against Scott in 2015, the dispute narrowed to whether and to what extent the government's tax liens attached to certain assets.  After the district court set aside the Bakers' separation agreement as a fraudulent transfer, it proceeded to re-divide and reallocate these assets applying Massachusetts law.  The government's tax liens attached directly to any assets allocated to Scott.  The government also argued that its tax liens attached indirectly to certain assets allocated to Robyn.

This appeal concerns the district court's allocation of two assets in particular (1) funds that were directly traceable to Scott's tax shelter (the "Escrowed Funds"); and (2) a property the Bakers owned in Hingham, Massachusetts (the "Hingham property").  The district court divided both assets more or less evenly,

---

[1]   As will become clear in this opinion, Robyn appears to be implicated in at least some of Scott's fraudulent activity. However, she was never put on trial, and it appears that the government is not pursuing any claims for fraud against her.  As such, nothing in this opinion is meant to suggest that Robyn has been found guilty of fraud.

reasoning that it was applying "an equitable 50/50 division of the couple's assets consistent with the common-law community property system adopted by Massachusetts and recognized as valid by the IRS."  In order to effectuate this division as to the Hingham property, the court ordered it to be sold and half the proceeds to be paid to the government and half to Robyn.

The government challenges the 50/50 division of the Escrowed Funds on the ground that Massachusetts is not a community property state.  In fact, Massachusetts law requires a judge to consider, either explicitly or by clear implication, fourteen factors in order to arrive at an equitable division of the parties' assets.  See Bowring v. Reid, 503 N.E.2d 966, 967-68 (Mass. 1987).  Because it is not clear to us that the district court considered these fourteen factors, we vacate and remand the division of the Escrowed Funds.

The government does not challenge the 50/50 division of the Hingham property.  Instead, it argues that it is entitled to Robyn's half of the proceeds from the sale on a lien-tracing theory.  The district court rejected this theory on the ground that the government had not submitted evidence sufficient to trace the liens with the required level of specificity.  We affirm this aspect of the district court's ruling.

## I. Background

**A. Factual History**

In December 2002, Scott G. Baker and his business partner sold eight Planet Fitness gyms to Bally Fitness for approximately $15 million, including Bally Fitness stock that he later sold for $3.4 million. He used a Son-of-BOSS tax shelter[2] to reduce his taxable income on gains from the Planet Fitness sale, claiming a negative $2.5 million in income in his 2002 return, which he filed separately from his wife. Scott then amended his tax returns for 1997-2001 to carry back the loss, leading the IRS to refund "virtually all" of the taxes the Bakers had paid in the years 1999-2001.

In June of 2003, and as part of the Son-of-BOSS tax shelter, Scott established and became the settlor of the "Scott Baker Family Trust" (the "Family Trust") in the Cayman Islands.

_____

[2] Son-of-BOSS (Bond Options Sales Strategy) tax shelters involve creating capital losses on paper to offset real capital gains. See, e.g., Fid. Int'l Currency Advisor A Fund, LLC v. United States, 661 F.3d 667, 668 (1st Cir. 2011) ("the plan . . . put into effect required [the U.S. taxpayer] to form a partnership with a foreign national; that partnership would engage in transactions that would generate largely offsetting gains and losses without net risk; the gain component would be principally allocated to the foreign national; the loss component would be principally allocated to [the U.S. taxpayer] and used on his individual return to offset gains on his exercise of the [] stock options, virtually eliminating tax on those gains.").

He chose Royal Bank of Canada Trust Company to be the initial trustee, and granted himself a one-third beneficial interest, with the remaining interests divided among Robyn and their two children. Scott had the power to add or exclude beneficiaries and to appoint successors to the trustee(s). The trustee(s) had discretion to disburse the funds in the Family Trust to any of the beneficiaries, to end the trust at any time, and to invest its capital and income.

Scott deposited the proceeds from the sale of the Bally Fitness stock into the Family Trust, and instructed the Trustee to invest the corpus of the Family Trust into a hedge fund called International Management Associates ("IMA"). Late in 2005, the Bakers learned that IMA was in fact a Ponzi scheme and that all of the money had disappeared. IMA filed for bankruptcy in 2006.

In August of 2005, the Bakers purchased a home in Hingham, Massachusetts, which they owned as tenants by the entirety, for just over $1.6 million. In the same month, the IRS opened an examination of Scott Baker's 2002 tax return. Scott agreed to participate in the IRS's Global Settlement Initiative, agreeing to pay $1.2 million in outstanding taxes. However, he was removed from the program in 2007 after the IRS determined he was unable to pay the agreed amount through his disclosures on Form 433-A, which "collect[s] information on a debtor's current assets when he or she claims an inability to pay the taxes owing."

Scott contends that his inability to pay was due to the losses he suffered in the IMA Ponzi scheme.

In February 2007, the Bakers remortgaged their Hingham property with Scott as the sole mortgagor; on the same day, they established the S&R Realty Trust with Robyn as trustee and transferred the title of their Hingham Property into the trust. They also established the C&S Realty Trust on the same day, with Robyn as sole trustee and their two children as primary beneficiaries, and transferred into it a beach house located in Scituate, Massachusetts. Scott did not receive any consideration for transferring his interests in the properties to the trusts. In November 2007, Robyn sold the Scituate property and deposited the $433,000 in proceeds into a South Shore Bank account owned by C&S Trust. She used the majority of the money to pay down loans secured by the Hingham property, and the remainder on living expenses.

On January 10, 2008, the Bakers signed a separation agreement, and the following day the two filed for divorce. The agreement, which was incorporated into the final divorce judgment, gave most of the assets to Robyn, but most of the liabilities to Scott. Robyn received sole ownership of the Hingham Property, as well as of the New Hampshire properties worth $200,000 as of March of 2007. She also received a boat, a car, two motorcycles, and

title to any money recovered from the IMA investment. Scott, on the other hand, assumed the $875,000 mortgage on the Hingham Property. According to his testimony, he "regularly made monthly payments" to Robyn of $6,200 to apply to the mortgage. He received real property relating to his construction business, and he agreed to assume all marital credit card debt and all liability relating to his construction business. He maintained sole ownership of his business ventures, including a Planet Fitness gym in Scarsdale, New York, with an asserted worth of $250,000 at the time of divorce. Scott claimed losses on this business in both his 2007 and 2008 federal income tax returns.

The agreement stipulated that Scott could continue to reside in the Hingham Property, and he did so after the divorce became final in May of 2008. After the divorce, Robyn continued to refer to Scott as her husband, though she testified that those references were mistakes or oversights. Scott testified that he had never told his children of the divorce, and he did not know if they were aware of the separation. The Bakers continued to vacation together, often with their family friends, Michael Theriault and his wife Lori Leo. Theriault testified that the Bakers took an estimated fifteen ski trips with them, as well as numerous camping trips. Theriault also estimated that over the course of four years, he and his wife had dinner with the Bakers

approximately 250 times. For the duration of their friendship, Theriault and Leo were under the impression that the Bakers were married. Their friendship eventually went sour, after Robyn, who had been working for Leo, went to work for a competitor. Around the same time, it came to light that Theriault and Robyn had been having sexual relations. When Theriault went to talk to Scott shortly thereafter, Scott allegedly assaulted him, gouged out Theriault's artificial eye and attempted to gouge out his good eye as well.

On May 14, 2009, the IRS determined that Scott had underpaid his taxes for the years 1997-2002 and assessed taxes and penalties for the 1997, 1998, and 2002 tax years. On May 20, 2010, it made additional assessments for the years 1999-2001. Per I.R.C. § 6321, federal tax liens "arose on the dates of assessment . . . and attached to all of [Scott's] property and interests in property."

In November of 2012, the trustee of the IMA bankruptcy issued a check to the Family Trust for just over $202,000 and mailed the check to Scott, who testified that he was "flabbergasted" to have recovered any money. Robyn -- who had by this time been made the sole trustee of the Family Trust -- invested the money from the IMA bankruptcy payment into a design company owned by a friend, which then hired Scott to do

-8-

construction on a home being built by the company. She testified that she gave the money to the company in $9,000 increments because she "didn't want the IRS to take [her] money." The value of this investment subsequently increased to $528,962.28.

The Family trust received a second payment from the IMA bankruptcy for $84,000, which Robyn used to pay legal fees for both her and Scott. Finally, a third payment from the IMA bankruptcy for $70,116.49 was added to the Bakers' share of the proceeds from the design business to comprise the escrowed funds now at issue, for a total of $599,078.77 (the "Escrowed Funds").

## B. Procedural History

The United States commenced this suit in May 2013 when Scott failed to pay the tax liabilities assessed against him. The United States sought collection of the tax liabilities, as well as enforcement of federal tax liens against property that had been fraudulently transferred to Robyn and liens attached to a property interest held by Robyn. The United States claimed first that Scott had fraudulently transferred to Robyn his interest in the Hingham Property, and second that the federal tax liens had attached to the Hingham Property to the extent of the mortgage payments that Scott made after the tax liens arose.

On January 29, 2015, the district court entered an agreed judgment against Scott in the amount of $5,026,915.43 for federal

income taxes due for the years 1997-2002. Thus, the dispute was narrowed to the issue of the extent to which the tax liens attached to various assets.

On August 17, 2015, following a bench trial, the district court found that the February 2007 transfers of property into trusts were fraudulent and that the Bakers had divorced with the purpose of fraudulently transferring assets. It identified several "badges of fraud" under the Massachusetts Uniform Fraudulent Transfer Act that applied to the property transfers in the Bakers' 2008 settlement agreement, including that: (1) they continued to live together after their divorce; (2) Scott remained at the Hingham Property and made the majority of the mortgage payments; (3) they concealed the divorce and held themselves out as married; (4) Robyn received substantially all of Scott's assets in the divorce agreement; (5) they hid assets after the divorce; (6) there was not adequate consideration for Scott's transfer; (7) Scott was insolvent when the transfer occurred; and (8) the transfer was made after a substantial debt was incurred. The district court also found additional indicia that the divorce had been obtained so as to fraudulently transfer assets: (1) only Robyn had been represented by counsel; (2) they continued to live together in the house that had been transferred by the divorce; (3) Scott paid the mortgage and other bills related to the house; and (4) Robyn

-10-

received most of the assets while Scott received most of the debts in the divorce.

The district court accordingly entered a partial judgment on October 23, 2015, holding in favor of the United States on a theory of fraudulent transfer, adding that while the government's lien-tracing claim was "not rejected," it was also "not embraced." The district court found that the government's tax liens attached to Scott's one-half interest in the Hingham Property, and ordered that the property be sold to satisfy Scott's tax liabilities. It also ruled that Scott had one-half interests in the New Hampshire properties and other personal property, which he had fraudulently conveyed to Robyn, and that the government could take necessary action to recover those assets. Finally, it found that the liens attached to Scott's interest in the Escrowed Funds and ordered the funds be turned over to the United States, giving Robyn time to submit a claim for whatever portion of the funds she believed she was due. The district court did not resolve which portion of the Escrowed Funds Robyn was entitled to. Rather, the district court indicated that it would "separately adjudicate the matter unless the parties are able to come to an agreement on an appropriate division of the escrowed funds."

After the parties failed to reach such an agreement, the district court divided the Escrowed Funds evenly between Scott and

Robyn.  The district court noted that it had applied "an equitable 50/50 division of the couple's assets consistent with the common-law community property system adopted by Massachusetts and recognized as valid by the IRS" for the division of the couple's real property.  Because the district court saw "no reason to depart from the 50/50 equitable formula," it used the same formula to divide the Escrowed Funds.  It also deemed Scott to be entitled to half of the $84,000 second payment from the IMA bankruptcy and Robyn to have taken that entire payment for herself.  Thus, it compensated Scott for his $42,000 share of that payment out of the Escrowed Funds.  By the court's final calculations, Robyn was found entitled to $256,539.38, with the remaining $342,539.39 going through Scott to the United States.[3]  The United States now appeals.

## II.  Standard of Review

This Court generally "review[s] a district court's ultimate decision to grant or withhold an equitable remedy for abuse of discretion."  Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 875 (1st Cir. 1995).  However, where a court applies "an improper standard to the facts, it may be corrected as a matter of law."  United States v. Singer Mfg. Co., 374 U.S. 174,

---

[3]  The United States notes that the district court appears to have made a mathematical error: the government's share should have been $341,539.39, and Robyn's share $257,539.38.

194 n.9 (1963). "[A] district court by definition abuses its discretion when it makes an error of law." Alison H. v. Byard, 163 F.3d 2, 4 (1st Cir. 1998).

Determinations regarding the sufficiency of evidence during a bench trial are legal determinations, and hence are reviewed de novo. See In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 162-63 (1st Cir. 2009) (citing United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001)).

### III. Discussion

**A. The Escrowed Funds**

Although the divorce of the Bakers was entered into in order to fraudulently transfer assets, the divorce itself is not therefore invalid. Consequently, it fell to the district court to divide the marital assets following the divorce. In Massachusetts, such a division is governed by Mass. Gen. Laws ch. 208, § 34 ("§ 34"). The district court stated that it "applied an equitable 50/50 division of the couple's assets consistent with the common-law community property system adopted by Massachusetts and recognized as valid by the IRS."

Contrary to the statement of the district court, Massachusetts is not a community property state, and its laws do

not prescribe a "50/50" division of marital assets upon divorce.[4] Rather, Massachusetts law requires "an equitable, rather than an equal division of property." Williams v. Massa, 728 N.E.2d 932, 939 (Mass. 2000). In order to arrive at this equitable division, a court must consider

> the length of the marriage, the conduct of the parties during the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties, the opportunity of each for future acquisition of capital assets and income, and the amount and duration of alimony, if any, . . . [as well as] the present and future needs of the dependent children of the marriage.

Mass. Gen. Laws ch. 208, § 34. In addition, a court may, but need not, consider "the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates and the contribution of each of the parties as a homemaker to the family unit." Id. Thus, § 34 "contains fourteen mandatory factors which the judge must consider, and four discretionary factors which the judge may consider." Bowring v. Reid, 503 N.E.2d 966, 968 (Mass. 1987).

In dividing assets under § 34, a court must also "ma[k]e findings consistent with [its] obligations under G.L. c. 208, § 34,

_____

[4] It is undisputed that Massachusetts law applies to the division of the various assets in this case.

-14-

indicating that [it] has fairly considered all factors relevant under § 34 and has not considered any irrelevant matter," in which case its determination "may not be reversed unless plainly wrong and excessive." Redding v. Redding, 495 N.E.2d 297, 300 (Mass. 1986) (citations omitted). The court's reasons for coming to its conclusions under § 34 "must be apparent in [its] findings and rulings." Id. at 301. "The rationale for the decision must appear in the judgment either explicitly or by clear implication," and "the mere listing of findings, even if detailed, is not enough." Bowring, N.E.2d at 968.

In the present case, while the district court did make extensive factual findings, it is not clear to us that the district court considered all the fourteen factors required under § 34. To the contrary, the district court used a "50/50 equitable formula" to divide the Escrowed Funds without explanation as to how any of the facts in the case factored into this decision. This implies that it did not consider the factors of § 34, but rather simply divided the property evenly between the Bakers.[5]

The government also argues that the district court, in dividing the Escrowed Funds, was wrong to consider Massachusetts's

---

[5] To the extent that the government urges us to apply the § 34 factors ourselves, we decline. The district court is in a better position to apply what are typically findings of fact.

"strong public policy of protecting the interests of nondebtor spouses." Bakwin v. Mardirosian, 6 N.E.3d 1078, 1085 (Mass. 2014). Because the district court appeared to have simply applied a "50/50" formula, however, it is not clear to us that this public policy factored into the district court's analysis in any way. To the extent that the district court did rely on this public policy, such reliance was misplaced. "The judge may consider only factors which are enumerated in § 34, in making alimony and property division determinations." Bowring, N.E.2d at 968 (emphasis added).

## B. The Hingham Property

The government also urges us to find that the district court erred in rejecting its lien-tracing theory. We decline to do so.

The government argues that its tax liens attached to any property Scott possessed on or after May 14, 2009, the date of the first tax assessment. The government infers from the Bakers' testimony that one of the Bakers made the mortgage payment on the Hingham property every month up to the time of trial, and that each payment was $6,200. The government notes that the district court found that Scott ultimately "made the majority of the mortgage payments." Thus, reasons the government, Scott must have paid at least half of the total mortgage payments made on the Hingham property between June 2009 and December 2014 (just before

-16-

the start of trial) using money on which the government had a tax lien. By that logic, the government concludes that it had a lien on the property no smaller than $6,200 times sixty-seven months divided by two, or $207,700. Dividing that lien between the two halves of the property, the government claims that it has a lien of $103,850 on Robyn's half, which exceeds her share of the sale proceeds. Thus, on this argument, the government would be entitled to all the proceeds from the sale of the Hingham property.

The government's argument suffers from a fatal flaw. The district court found that "for the lien tracing theory to be viable the government has the burden of showing with particularity the sums transferred by [Scott] Baker to which the tax liens attach." However, the district court never made a finding as to the amount or the number of the mortgage payments. The government relies entirely on the testimony of the Bakers -- which the government itself concedes was contradictory -- for the proposition that the amount of the payment was $6,200,[6] and then assumes that every payment during the relevant time period was made in full. The district court found "neither of the Bakers to be credible witnesses, at least insofar as their financial

---

[6] Indeed, Robyn Baker testified that "[c]urrently the mortgage is [$]6200 interest-only payments." This leaves open the possibility that the mortgage payments were not $6,200 at all times.

interests are concerned. Leo credibly testified that [Robyn] has problems with honesty. [Robyn] admitted that she struggles with the truth."

We agree with the district court that "the equivocal testimony of the Bakers by itself [is not] sufficient to satisfy the government's burden in a lien tracing context." The government has not here met its burden of distinctly tracing its lien, because the evidence it has presented is insufficient -- the government has proven neither the amount of any mortgage payment, nor has it proven that all mortgage payments were in fact made. We do not mean to hold that every time the government wishes to trace a lien it must be able to prove the amounts involved to the penny -- but it should present the court with more than the testimony of witnesses who struggle with the truth.[7]

## IV. Conclusion

For the foregoing reasons, the district court's February 19, 2016 Memorandum and Order, as well as paragraph 6 of the February 19, 2016 Amended Judgment, are vacated, and the case is remanded for further proceedings consistent with this opinion.

**Vacated and Remanded.**

---

[7] We have considered the parties' other arguments and found them to be without merit.

-18-