2002 UT App 56

**Robert W. PETERSON, a citizen of the State of Utah, Plaintiff and Appellant,**

v.

**DELTA AIR LINES, INC., a Delaware corporation, Defendant and Appellee.**

No. 20000067–CA.

Court of Appeals of Utah.

Feb. 22, 2002.

Donald L. Dalton, Dalton & Kelley, Salt Lake City, for Appellant.

Frederick R. Thaler, Janet Hugie Smith, and Paul C. Burke, Ray, Quinney & Nebeker, Salt Lake City, and Andrea Lynn Bowman, Atlanta, GA, for Appellee.

Before JACKSON, P.J., BILLINGS, Associate P.J., and ORME, J.

## OPINION

JACKSON, Presiding Judge.

¶1 Appellant Robert W. Peterson appeals the district court's Order of Dismissal, which granted Delta's motion to dismiss pursuant to Rule 12(b)(1) of the Utah Rules of Civil Procedure. The court explained that because Peterson's claims require interpretation of a collective bargaining agreement (CBA), they are preempted by the Railway Labor Act (RLA). We affirm.

## BACKGROUND

¶2 "In determining whether the trial court properly granted [Delta's] motion [to dismiss] we must accept the factual allegations in the complaint as true and consider all reasonable inferences to be drawn from those facts in a light most favorable to the plaintiff." *Prows v. State*, 822 P.2d 764, 766 (Utah 1991).

¶3 Peterson, a thirty-year veteran pilot with a good service record, retired on January 3, 1997, his sixtieth birthday, as required by Federal Aviation Administration (FAA) regulation. Prior to his retirement, Peterson looked forward to his ceremonial "final flight," a custom observed in the airline industry that involves celebration with family, friends, and associates upon the conclusion of a pilot's last flight as a commercial airline pilot. He scheduled this event, a round-trip European flight, months in advance to take place from December 31, 1996 to January 2, 1996.

¶4 On December 22, 1996, Delta placed Peterson on "short call" status, thereby greatly increasing his chances of being called to fly during the Christmas holiday. Peterson told Delta's Crew Scheduler: "I am not feeling well. Sorry to do this at Christmas time. Especially in my last month." The Crew Scheduler then reported Peterson as saying, "This is my last month with Delta, it's Christmas, I'm not feeling well, so show me sick," to Robert Anderson, Delta's Chief Pilot in Los Angeles. Under authority of the CBA, which governs the terms and conditions of pilots' employment, including all flight privileges, Anderson initiated an investigation into the legitimacy of Peterson's use of the sick leave policy.

¶5 On December 23, 1996, Anderson called Peterson and informed him that he was being suspended pending an investigation for abuse of the sick leave policy. Anderson also told Peterson that he would miss his final flight, and directed Peterson to be in Los Angeles to deliver a certificate of illness from his physician on December 26, 1996. On December 24, 1996, Peterson told Anderson "that because of the Christmas holiday, he could not get in to see his doctor until December 27." On Friday, December 27, Peterson received the required physician's certification, but was too late to deliver it to Anderson before the weekend. Thus, Peterson waited until Monday, December 30 to fly to Los Angeles and deliver the physician's certification. Peterson was reinstated and his flight privileges were restored the next day. However, Peterson's final flight was not restored due to FAA regulation.

¶6 Peterson filed an arbitration "grievance," pursuant to the CBA, with the System Board of Adjustment.[1] Although the System Board expunged Peterson's personnel file "of all correspondence and material relating to" the investigation, it granted no other relief, and because he had reached age sixty, FAA regulation would not allow Peterson to take his final flight. He then filed state law claims to obtain relief,[2] which the trial court dismissed on the ground that his claims were preempted by federal law. Peterson appeals.

---

1. Peterson suggested that his grievance was filed out of an abundance of caution and that it should not be deemed an election of remedies or indicative of whether his claim is governed by the CBA.

2. Although his complaint did not name them specifically, Peterson clarifies on appeal that his complaint states claims for breach of implied contract, civil conspiracy, and intentional infliction of emotional distress.

## ISSUE AND STANDARD OF REVIEW

¶ 7 Peterson challenges the district court's legal conclusion that his "claims cannot be resolved without analyzing and interpreting the collective bargaining agreement that governed [his] employment with Delta. As a result, [his] claims are pre-empted by the Railway Labor Act[, which also has application to the airline industry,] and must be dismissed." "Because the propriety of a motion to dismiss is a question of law, we review for correctness, giving no deference to the decision of the trial court." *Krouse v. Bower*, 2001 UT 28,¶ 2, 20 P.3d 895; *see also Walker v. Union Pac. R.R. Co.*, 844 P.2d 335, 340 (Utah Ct.App.1992) ("The lower court's preemption determination is a legal conclusion which we review for correctness, according it no particular deference.").

## ANALYSIS

¶ 8 The RLA preempts state law claims where in order to adjudicate those claims, the trial court must interpret the CBA.[3] *See Hawaiian Airlines v. Norris*, 512 U.S. 246, 262–63, 114 S.Ct. 2239, 2249, 129 L.Ed.2d 203 (1994); *accord Retherford v. AT & T Communications of the Mountain States, Inc.*, 844 P.2d 949, 968–69 (Utah 1992) ("The question before us, then, is whether resolution of the state law claim depends upon the interpretation of the collective bargaining agreement. If it does, [the RLA] preempts the state law cause of action."). However, " 'as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for [RLA] pre-emption purposes.' Under such circumstances, there is no ... preemption." *Retherford*, 844 P.2d at 969 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410, 108 S.Ct. 1877, 1883, 100 L.Ed.2d 410 (1988)).

¶ 9 Peterson challenges the trial court's conclusion that his claims were preempted because they "cannot be resolved without analyzing and interpreting the" CBA. "In order to determine whether resolution of [Peterson's] claims indeed depends upon the meaning of the collective bargaining agreement, we must examine the discrete elements of each claim." *Id.*

### I. Breach of Implied Contract

¶ 10 We first consider Peterson's claim for breach of implied contract. "To prevail on a claim of breach of implied contract, [Peterson] must prove the existence of an implied contract, created by mutual assent, and [Delta's] failure to comply with its terms." *Id.* at 967. Peterson argues that implied contract or custom governs a pilot's right to his last flight, and therefore creates a basis for state claims that is independent of the CBA. For Peterson's implied contract claim to be independent of the CBA, no part of the CBA could be applicable to or binding upon either party during his final flight. However, the CBA expressly governs "all flying performed by or for" Delta, and all exceptions to that rule. Further, "a CBA is more than the sum of its parts. It comprises express provisions, industry standards, and 'norm[s] that the parties have created but have omitted from the collective bargaining agreement's explicit language.' " *Fry v. Airline Pilots Ass'n Int'l*, 88 F.3d 831, 836 (10th Cir.1996) (quoting *Norris*, 512 U.S. at 264, 114 S.Ct. at 2250). Thus, Peterson may not rely upon implied contract or custom to endow his claims with independence from the CBA.

¶ 11 Moreover, Peterson's implied contract claim is dependent upon interpretation of the CBA because any separate agreement must be reviewed against the CBA to determine if it is inconsistent with the CBA. *See Retherford*, 844 P.2d at 969–70. As our

---

3. In *Hawaiian Airlines v. Norris*, the Supreme Court stated that the RLA is subject to the same standard that applies to preemption analysis under the Labor Relations Management Act (LRMA), as described in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408–410, 108 S.Ct. 1877, 1882–83, 100 L.Ed.2d 410 (1988). *See* 512 U.S. 246, 262–63, 114 S.Ct. 2239, 2249, 129 L.Ed.2d 203 (1994). In light of this ruling, we conclude that the Utah Supreme Court's preemption analysis in *Retherford v. AT & T Communications of the Mountain States, Inc.*, 844 P.2d 949, 969 (Utah 1992) (applying *Lingle* to LRMA preemption analysis), applies also to preemption analysis under the RLA.

supreme court stated in *Retherford*, "although any employee or group of employees can reach a separate agreement with the employer, that separate contract must not be inconsistent with the collective bargaining agreement negotiated by the union.... [I]nconsistent separate agreements are not enforceable." *Id.* at 969 (internal citations omitted). Thus, Peterson's breach of implied contract claim cannot be resolved without examining the CBA to discover whether Peterson's claim is inconsistent with it. Accordingly, the district court correctly concluded that this claim could not be resolved independently of the CBA, and that it is thus preempted by the RLA. *See Norris,* 512 U.S. at 262–63, 114 S.Ct. at 2249.

## II. Civil Conspiracy

¶ 12 Next, we address Peterson's civil conspiracy claim. "To prove civil conspiracy, five elements must be shown: '(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.' " *Alta Indus. v. Hurst,* 846 P.2d 1282, 1290 n. 17 (Utah 1993) (citation omitted). Regarding the unlawful act element, we have previously stated,

> To assert civil conspiracy, plaintiff must also prove that the alleged conspirators performed one or more unlawful, overt acts. If the object of the alleged conspiracy or the means used to attain it is lawful, even if damage results to the plaintiff or the defendant acted with a malicious motive, there can be no civil action for conspiracy.

*Israel Pagan Estate v. Cannon,* 746 P.2d 785, 792 (Utah Ct.App.1987). The only allegedly unlawful event referenced in Peterson's complaint is Delta's request that Peterson be in Los Angeles to deliver a note from his physician certifying his illness. On appeal, Peterson attempts to clarify that his complaint alleged another unlawful act: that Delta unlawfully withheld his flight privileges following its investigation based merely on "a malicious motive." *Id.*

¶ 13 However, even if Delta "acted with a malicious motive," either by maliciously pursuing the investigation and requiring him to be in Los Angeles with a note from his physician or by maliciously failing to restore his flight privileges in time for him to take his final flight, "there can be no civil action for conspiracy" unless those maliciously motivated acts were unlawful. *Id.* In turn, whether those acts were unlawful depends upon what authority Delta has (1) to conduct the investigation—including the scope and means of carrying out the investigation; (2) to request Peterson's presence in Los Angeles with a note from his physician; and (3) to withhold his flight privileges. Delta's managerial authority in these matters is governed by the CBA. *See Steinbach v. Dillon Cos.,* 253 F.3d 538, 542 (10th Cir.2001); *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 530 (10th Cir.1992). Whether Delta's actions were unlawful also depends upon the source and extent of Peterson's flight privileges, which are likewise governed by the CBA. Thus, determining the extent of Delta's authority and Peterson's flight privileges would inevitably require interpretation of the CBA. Accordingly, the district court did not err in concluding that Peterson's civil conspiracy claim could not be resolved independently of the CBA, and that it is thus preempted by the RLA. *See Norris,* 512 U.S. at 262–63, 114 S.Ct. at 2249; *Retherford,* 844 P.2d at 969–70.

## III. Intentional Infliction of Emotional Distress

¶ 14 Finally, we examine Peterson's claim for intentional infliction of emotional distress.

> To prove such a claim, a plaintiff must show (a) that the defendant intentionally engaged in some conduct toward the plaintiff considered outrageous and intolerable in that it offends the generally accepted standards of decency and morality (b) with the purpose of inflicting emotional distress or where any reasonable person would have known that such would result, and (c) that severe emotional distress resulted as a direct result of the defendant's conduct.

*Russell v. Thomson Newspapers Inc.,* 842 P.2d 896, 905 (Utah 1992). Peterson argues that Delta met these elements when it withheld his flight privileges, intending and achieving the result that Peterson lose his final flight. Peterson correctly asserts that an emotional distress claim does not necessarily require interpretation of the CBA. *See Garley v. Sandia Corp.,* 236 F.3d 1200, 1214 (10th Cir.2001); *Retherford,* 844 P.2d at 971–72. Indeed,

> [i]n considering ... preemption of tort claims alleging infliction of emotional distress by a supervisor or fellow employee, courts seem to have distinguished between situations in which the defendant has misused his or her authority under a collective bargaining agreement to torment the plaintiff and situations in which the defendant has inflicted the distress *through conduct that is purely personal and does not implicate the exercise of supervisory authority.*

*Retherford,* 844 P.2d at 971 (emphasis added).

¶ 15 Peterson argues that Delta's conduct, because it was motivated "for reasons that had nothing to do with a lawful sick leave investigation ... was purely the result of purely personal misconduct," and thus does not implicate the exercise of supervisory authority. We disagree. Although Peterson argues that Delta's *intent* was personal, the *conduct* Peterson ultimately complains of is Delta's withholding of his flight privileges. That conduct is an issue of managerial authority, which is governed by the CBA. Thus, "a state court would have to interpret the [CBA]'s provisions regulating the terms and conditions of [Peterson]'s employment to determine whether [Delta]'s actions were indeed arbitrary, unjustified, unwarranted, and excessive." *Retherford,* 844 P.2d at 972; *accord Garley,* 236 F.3d at 1214 (stating that determining whether an employer's exercise of managerial authority to conduct an investigation "was 'outrageous,' ... requires construction of [the employer's] rights and obligations under the CBA as that is the reference point against which [the employer's] action must be scrutinized"). Accordingly, the district court did not err in concluding that Peterson's emotional distress claim is preempted by the RLA. *See Norris,* 512 U.S. at 262–63, 114 S.Ct. at 2249; *Retherford,* 844 P.2d at 969–70.

### CONCLUSION

¶ 16 Resolution of each of Peterson's state law claims would require interpretation of the CBA. Thus, we affirm the district court's ruling that Peterson's state law claims are preempted by the RLA.[4]

¶ 17 WE CONCUR: JUDITH M. BILLINGS, Associate Presiding Judge, and GREGORY K. ORME, Judge.

---

4. In light of this conclusion, we decline to address Delta's arguments that we may affirm on other grounds.