**2018 UT App 31**

# THE UTAH COURT OF APPEALS

PAUL TIMOTHY AND JANICE TIMOTHY,
Appellants,
*v.*
PIA, ANDERSON, DORIUS, REYNARD & MOSS LLC
AND BRENNAN MOSS,
Appellees.

Opinion
No. 20150051-CA
Filed February 23, 2018

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 120905780

Nelson Abbott, Attorney for Appellants

J. Ryan Mitchell, John P. Mertens, and William O.
Kimball, Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE GREGORY K. ORME and SENIOR JUDGE STEPHEN L.
ROTH concurred.[1]

CHRISTIANSEN, Judge:

¶1     Paul Timothy and Janice Timothy (collectively, Creditors)
appeal the district court's grant of summary judgment in favor
of Pia, Anderson, Dorius, Reynard & Moss LLC (Law Firm) and
Brennan Moss (collectively, Appellees). We affirm.

---

1. Senior Judge Stephen L. Roth began work on this case as an
active member of the Utah Court of Appeals. He completed his
work as a senior judge sitting by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2     In 2002, Creditors brought suit against Thomas Keetch and Teri Keetch (collectively, Debtors) alleging, among other things, breach of contract and fraud. The case ultimately resulted in a 2009 judgment in Creditors' favor.[2]

¶3     In July 2009, approximately four months after entry of the judgment, all of Debtors' bank accounts were closed.[3] Then, in March 2010, Teri Keetch's high-school-aged son (Son) opened a bank account.[4] The district court later determined that both Teri Keetch and Son had access to all of the money in the account and that "[m]uch of the money in [Son's] bank account belonged to [Debtors]."[5]

¶4     On February 12, 2011, Son wrote a check for $50,000 from "his" account, payable to Law Firm. The check's memo line read "Terry Keetch." Law Firm deposited the check into its trust account around March 15, 2011. The district court later found that the $50,000 was Debtors' money.

---

2. A more detailed summary of the facts surrounding Creditors' suit against Debtors may be found in *Timothy v. Keetch*, 2011 UT App 104, 251 P.3d 848, in which this court affirmed the trial court's ruling. *Id.* ¶¶ 1–9.

3. According to Teri Keetch, Debtors' bank closed the accounts. As of July 29, 2014, Debtors had not paid the judgment. And according to Creditors, Debtors "have not paid [the judgment] to this day."

4. Son's bank account appears to have been a joint account with Teri Keetch's mother.

5. For example, the district court found that since May 2010, Debtors had collectively made around seventy deposits into Son's bank account, totaling $186,283.93, and that Teri Keetch had written checks on Son's account totaling at least $6,462.34.

¶5    Four days before Law Firm deposited the $50,000 into its trust account, Debtors and Creditors attended a supplemental hearing to determine whether Debtors had assets that could be applied to the judgment. Brennan Moss, an attorney from Law Firm, represented Debtors at the hearing. During the hearing, Thomas Keetch testified that "he did not have a checking account, but that friends and family, specifically [Son], 'cashed' checks for him." Teri Keetch testified that she had no assets.[6]

¶6    On March 16, 2011, after the $50,000 was deposited into Law Firm's trust account, Thomas Keetch signed an addendum to a real estate purchase contract, which stated that Debtors would "place in a trust [with] their attorney, Brennan Moss, a sum of no less than 30,000" to help secure a home Debtors

---

6. Although Law Firm did not deposit the $50,000 check into its trust account until March 15, 2011, the record suggests that Law Firm was in possession of the check at the time of the supplemental hearing. Creditors observe that "Brennan Moss sat in the supplemental proceeding and heard [Debtors] testify that they had no assets, could not pay the judgment[,] and were insolvent," and Creditors fault Moss for "not correct[ing] this false testimony."

   If Moss knew that Debtors had misrepresented their financial circumstances during the supplemental hearing, his failure to correct them, while not per se unlawful, may have run afoul of the Utah Rules of Professional Conduct. *See, e.g.*, Utah R. Prof'l Cond. 3.3(b) ("If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."); *id.* R. 3.3(c) ("A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging, or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.").

wanted to purchase. Subsequently, Law Firm transferred $20,000 from the trust account to a title company for Debtors as a down payment on the home. Two months later, at the request of Debtors, Law Firm transferred an additional $20,560.75 out of its trust account and paid $2,745 to itself, $16,451.75 to one of Debtors' family members, and $1,364 to Creditors.[7] The payment to Creditors was made in response to a court order entered on May 27, 2011.

¶7    In August 2012, Creditors filed suit against Appellees. Creditors later filed an amended complaint, alleging various theories of fraudulent transfer against Law Firm, participation in wrongful conduct against Moss individually, and civil conspiracy against Appellees collectively. Appellees filed a motion for summary judgment, arguing that Law Firm was not a transferee under Utah's Uniform Fraudulent Transfer Act. *See* Utah Code Ann. §§ 25-6-1 to -14 (LexisNexis 2013).[8] The district court agreed and granted Appellees' motion for summary judgment, concluding that

> [b]ecause the relevant provisions of the Utah Uniform Fraudulent Transfer Act were modeled on federal Bankruptcy law, the court is persuaded that "transferee" as used in the Act is most logically

---

7. Appellees correctly note that the district court's finding that the $50,000 was actually Debtors' money, *supra* ¶ 4, was entered after Law Firm had distributed the funds.

8. Utah's version of the Uniform Fraudulent Transfer Act was amended, renumbered, and renamed as the Uniform Voidable Transactions Act, effective May 9, 2017. *See* Utah Code Ann. §§ 25-6-101 to -502 (LexisNexis Supp. 2017). Because the 2017 amendment took effect after the relevant events in this case occurred and after oral argument before this court, we cite the 2013 version of the Uniform Fraudulent Transfer Act throughout this opinion. *See id.* §§ 25-6-1 to -14 (2013).

defined in the manner it has been defined in the Bankruptcy context. That is, a "transferee" must exercise dominion or control over the transferred asset. Here, the law firm did not—and could not—exercise dominion and control over funds held in the firm's trust account. The Rules of Professional Conduct explicitly prevent a law firm from using those funds at their discretion. Accordingly, the Law Firm was not a "transferee" within the meaning of the Act and the Judgment Creditors' fraudulent conveyance claims fail as a matter of law. Those claims are hereby dismissed with prejudice.

Appellees then filed a second motion for summary judgment, arguing that Creditors' claim that Appellees "conspired to assist [Debtors] in transfers that violated the [Uniform Fraudulent Transfer Act]" was "insufficient to support [Creditors'] civil conspiracy claim because it is not a valid tort claim against [Appellees]." The district court observed that

> [a]lthough the question has not been addressed by Utah's appellate courts, the majority view appears to be that state and federal statutes governing "fraudulent" conveyances are not based on tort principles. Moreover, and perhaps more important, the majority view appears to be that tort principles, such as civil conspiracy and aiding and abetting, cannot be used to get around the statutory limits of fraudulent conveyance actions; namely, those that limit the reach of such statutes to "transferees."

The court was "persuaded that if presented with the question, Utah's appellate courts would . . . not permit civil conspiracy, aiding and abetting, or similar theories to extend the reach of the Utah Uniform Fraudulent [Transfer] Act." Consequently, the

district court granted Appellees' second motion for summary judgment and dismissed Creditors' remaining claims with prejudice. Creditors appeal.

ISSUES AND STANDARDS OF REVIEW

¶8    Creditors contend that the district court erred in granting Appellees' motions for summary judgment. First, Creditors argue that "[a] law firm that receives money into its [trust] account is a transferee as defined by the Utah Fraudulent Transfer Act" and that the district court "erroneously determined that a transferee is defined by bankruptcy law rather than by Utah Statute." Second, Creditors contend that "[v]iolation of the Utah Fraudulent Transfer Act may serve as a predicate act to support a claim for civil conspiracy."

¶9    We review "a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted). Likewise, "[w]e review a district court's interpretation and application of a statute for correctness." *Robinson v. Robinson*, 2016 UT App 32, ¶ 35, 368 P.3d 147.

ANALYSIS

I.

¶10   Creditors first contend that "[a] law firm that receives money into its [trust] account is a transferee as defined by the Utah Fraudulent Transfer Act."

¶11   Utah's Uniform Fraudulent Transfer Act (the Act), *see* Utah Code Ann. §§ 25-6-1 to -14 (LexisNexis 2013), was designed

to prevent fraudulent transfers of assets by debtors who seek to defraud creditors or avoid debts by placing assets beyond creditors' reach, *see Bradford v. Bradford*, 1999 UT App 373, ¶ 14, 993 P.2d 887. Pursuant to section 25-6-5 of the Act, a fraudulent transfer occurs when a debtor (a) transfers property with actual intent to hinder, delay, or defraud any creditor, or (b) transfers property under certain conditions without receiving reasonably equivalent value in exchange. Utah Code Ann. § 25-6-5(1). If a transfer is demonstrated to be fraudulent, the Act provides creditors with various remedies "for relief against a transfer or obligation," including, among others, "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.* § 25-6-8(1)(a).

¶12 Generally, "[a] transfer or obligation is not voidable under Subsection 25-6-5(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." *Id.* § 25-6-9(1). "[T]o the extent a transfer is voidable in an action by a creditor under Subsection 25-6-8(1)(a), the creditor may recover judgment for the value of the asset transferred, . . . or the amount necessary to satisfy the creditor's claim, whichever is less." *Id.* § 25-6-9(2). Relevant to this case, the judgment may be entered against "the *first transferee* of the asset or the person for whose benefit the transfer was made." *Id.* § 25-6-9(2)(a) (emphasis added). The primary issue on appeal is whether, pursuant to subsection 25-6-9(2)(a) of the Act, Law Firm was the "first transferee" of the $50,000. *See id.*

A. The definition of "first transferee"

¶13 The Act does not define "first transferee" for purposes of subsection 25-6-9(2)(a), and Utah appellate courts have not yet articulated a definition.

¶14 Creditors assert that we "should adopt a definition of the word 'transferee' as used in the [Act] as any person who receives

an asset by transfer"[9] and that under this definition, Law Firm was a transferee. In making their argument, Creditors rely on the definition of "transferee" from other sections of the Utah Code. For example, Creditors cite the Utah Uniform Partnership Act, which defines transferee as "a person to which all or part of a transferable interest has been transferred, whether or not the transferor is a partner." Utah Code Ann. § 48-1d-102(26) (LexisNexis 2015); *see also id.* § 48-2e-102(27) (similar definition of transferee in the Utah Uniform Limited Partnership Act); *id.* § 48-3a-102(30) (similar definition of transferee in the Utah Revised Uniform Limited Liability Company Act). Creditors also rely on Black's Law Dictionary, which defines "transferee" as "[o]ne to whom a property interest is conveyed." *Transferee*, Black's Law Dictionary (10th ed. 2014).

¶15 Appellees, on the other hand, assert that this court should look to federal bankruptcy law for guidance and "require a 'transferee' to be someone who exercise[s] dominion or control over an asset" and that "[u]nder the dominion and/or control tests, [Law Firm] is not a transferee."[10] According to Appellees, this court should "turn to bankruptcy law for guidance" because subsection 25-6-9(2) of the Act "parallels the Bankruptcy Code, which provides for recovery 'from . . . the initial transferee of

---

9. The Act defines "'[t]ransfer'" as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Utah Code Ann. § 25-6-2(12) (LexisNexis 2013). The Bankruptcy Code's definition of "transfer" is substantially similar to the Act's definition. *Compare id., with* 11 U.S.C. § 101(54) (2012).

10. Alternatively, Appellees contend that "[d]epositing money into a law firm's [trust] account does not dispose of the money, and thus is not a 'transfer' under the [Act]." We address this argument *infra* ¶ 28.

such transfer or the entity for whose benefit such transfer was made.'" (Quoting 11 U.S.C. § 550(a) (2012).) *See also Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 165 (Tex. App. 1996) (observing that "[s]imilar to the fraudulent transfer statutes . . . the Bankruptcy Code allows the bankruptcy trustee to avoid certain transfers"). Appellees rely on a long line of cases decided under subsection 550(a)(1) of the Bankruptcy Code, which hold that one must have dominion or control over the debtor's funds to be an initial transferee.

¶16    Similar to the Act, the Bankruptcy Code allows the bankruptcy trustee to avoid certain transfers. *Compare* Utah Code Ann. §§ 25-6-8, -9, *with* 11 U.S.C. §§ 547, 550 (2012). Section 550 of the Bankruptcy Code provides that the bankruptcy trustee may recover a preference avoided under section 547 from the "initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). Because the Bankruptcy Code does not define "initial transferee," the courts have sought to articulate a definition.

¶17    The leading case on this issue is *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988), in which the Seventh Circuit Court of Appeals articulated the "dominion test." The court held that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 893; *see also id.* ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."); *accord In re Incomnet, Inc.*, 463 F.3d 1064, 1070 (9th Cir. 2006) (observing that the *Bonded* decision is "the leading case in this area" and that "[t]he inquiry focuses on whether an entity had *legal authority* over the money and the right to use the money however it wished" (emphasis added)). The Seventh Circuit clarified that an entity does not have "dominion" over funds until it is, in essence, "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded*, 838 F.2d at 894. Applying the dominion test, the *Bonded* court concluded that the financial intermediary (a bank), which "[u]nder the law of

contracts . . . had to follow the instructions that came with the check," was not the initial transferee of the check because the bank held the funds "only for the purpose of fulfilling an instruction to make the funds available to someone else." *Id.*

¶18    The Eleventh Circuit Court of Appeals took a slightly different, but similar, approach and set forth the "control test." *See Nordberg v. Societe Generale* (*In re Chase & Sanborn Corp.*), 848 F.2d 1196, 1199 (11th Cir. 1988). This test "requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Id.*; *see also id.* ("This approach is consistent with the equitable concepts underlying bankruptcy law."). Thus, under the control test, "the outcome of the cases turn on whether the [receiving parties] actually controlled the funds or merely served as conduits, holding money that was in fact controlled by either the transferor or the real transferee." *Id.* at 1200; *see also id.* ("When banks receive money for the sole purpose of depositing it into a customer's account . . . the bank never has actual control of the funds and is not a section 550 initial transferee."). The court noted that as a matter of public policy, it would be "especially inequitable to hold conduits liable in situations in which the conduits cannot always ascertain the identity of the transferor." *Id.* at 1201.

¶19    "A number of circuits combined these tests—or at least combined their names—creating a 'dominion and control test' to determine whether a party is an initial transferee." *In re Incomnet*, 463 F.3d at 1069, 1070–71 (applying the dominion test from *Bonded* and observing that the dominion and control tests "do differ"); *see also* Jessica D. Gabel & Paul R. Hage, *Who Is A "Transferee" Under Section 550(a) of the Bankruptcy Code?: The Divide Over Dominion, Control, and Good Faith in Applying the Mere Conduit Defense*, 21 J. Bankr. L. & Prac. 1 Art. 3 (Jan. 2012) (observing that nearly all of the federal appellate courts that have "opined on the mere conduit defense" "have adopted *Bonded*'s 'dominion test' in one form or another, although many of the courts appear to have combined the 'dominion test' with the 'control test,' at least by name, applying what they refer to as

a 'dominion and control' test"); *see also, e.g., In re Hurtado*, 342 F.3d 528, 533 (6th Cir. 2003) (observing that the *Bonded* test "has come to be known as the dominion-and-control test, and has been 'widely adopted'" and stating that "[a]n initial transferee must have 'dominion' over the funds to be an 'initial transferee'" (citation omitted)); *In re Ogden*, 314 F.3d 1190, 1202, 1204 (10th Cir. 2002) (applying the "dominion and control test" from *Bonded* and observing that "[i]n order to be a transferee of the debtor's funds, one must (1) actually receive the funds, and (2) have *full* dominion and control over them for one's own account, *as opposed to receiving them in trust or as agent for someone else*" (alteration in original) (citation and internal quotation marks omitted)); *Christy v. Alexander & Alexander of New York Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey*), 130 F.3d 52, 56–58 (2d Cir. 1997) (stating that "[t]he Seventh Circuit's logic [in *Bonded*] has been widely adopted," joining "these other circuits in adopting the 'mere conduit' test," and observing that "the wording of section 550(a) is not so plain as to compel, or persuasively argue for, the principle that every conduit is an initial transferee"); *id.* at 56 ("The statutory term is 'transferee'—not 'recipient'—and is not self-defining. Numerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch the disputed funds—and the initial transferee under section 550."); *Bowers v. Atlanta Motor Speedway, Inc.* (*In re Southeast Hotel Props. Ltd.*), 99 F.3d 151, 155–56 (4th Cir. 1996) (reviewing "the decisions of courts that have required *legal* dominion and control over the funds to constitute an 'initial transferee' and the decisions of courts that have required merely *physical* dominion and control" and adopting "the dominion and control test as set forth in *Bonded*," i.e., "a person or entity must have exercised legal dominion and control over the property" to be an initial transferee).

¶20   In *Security First National Bank v. Brunson* (*In re Coutee*), 984 F.2d 138 (5th Cir. 1993), the Fifth Circuit Court of Appeals applied a "dominion or control test" to circumstances similar to this case. *Id.* at 141. In that case, the debtors received a check in satisfaction of a judgment and endorsed it to a law firm. *Id.* at

¶40. The law firm then deposited the funds into its trust account, claimed its legal fees out of the funds, returned a portion of the award to the debtors, and transferred the remaining funds to a bank in satisfaction of the debtors' loan. *Id.* In concluding that the bank, not the law firm, was the initial transferee of the funds under section 550(a)(1) of the Bankruptcy Code, the Fifth Circuit explained:

> Adopting the dominion or control test, we find that the bank, not the [law] firm, was the initial transferee of the funds. As the district court noted, the funds were deposited into the firm's trust account, as opposed to its business account, indicating that they were held merely in a fiduciary capacity for the [debtors]. Moreover, the negotiations regarding the firm's legal fees, which occurred after it received the funds, indicate that the firm was not free at that time simply to keep the money. The only control exercised over the funds was the control delegated to the law firm by the [debtors]. As the bankruptcy court noted, "[t]he law firm, under Louisiana law, was required to keep the client's funds in an identifiable trust account in order to avoid the charge of conversion."
>
> . . . The firm's role with respect to the received money was to accept the funds in settlement of its client's case, deposit the money in trust, keep as fees only what the [debtors] agreed to, and pay the rest to the bank on behalf of the [debtors] in satisfaction of their loan. The law firm had no legal right to put the funds to its own use, and thus lacked the requisite dominion required to be the initial transferee.

*Id.* at 141 (citations omitted).

¶21 Turning to the Act, the analog of subsection 25-6-9(2) of the Act is contained in section 8(b) of the Uniform Fraudulent Transfer Act (the Uniform Act).[11] *See* Uniform Fraudulent Transfer Act § 8(b) (Nat'l Conference of Comm'rs on Unif. State Laws 1984), http://www.uniformlaws.org/shared/docs/fraudulent%20transfer/UFTA_Final_1984.pdf [https://perma.cc/M9JM-4BVG]. As the district court correctly noted, "[t]he drafter's comments to the Uniform Act give little insight into what they intended 'transferee' to mean." Indeed, the comment from the Uniform Act relating to section 8(b) simply states, "*Subsection (b) is derived from § 550(a) of the Bankruptcy Code.* The value of the asset transferred is limited to the value of the levyable interest of the transferor, exclusive of any interest encumbered by a valid lien." Uniform Fraudulent Transfer Act § 8(b) cmt. 2 (emphasis added). *See generally Carlie v. Morgan*, 922 P.2d 1, 7 (Utah 1996) (Howe, J., concurring) ("[C]omments by the drafters of uniform acts are not written into the statute when

---

11. The Uniform Fraudulent Transfer Act is now titled the Uniform Voidable Transactions Act (UVTA). *See* http://www.uniformlaws.org/Act.aspx?title=Voidable%20Transactions%20Act%20Amendments%20(2014)%20-%20Formerly%20Fraudulent%20Transfer%20Act [https://perma.cc/L7R4-FBHK]. The Uniform Act was amended in 2014 to "address a small number of narrowly-defined issues." *Id.* The retitling was not motivated by the "relatively minor" 2014 amendments, but because "the word 'Fraudulent' in the original title, though sanctioned by historical usage, was a misleading description of the [Uniform] Act as it was originally written. Fraud is not, and never has been, a necessary element of a claim for relief under the [Uniform] Act." Uniform Voidable Transactions Act § 15 cmt. 1 (Nat'l Conference of Comm'rs on Unif. State Laws 2014), http://www.uniformlaws.org/shared/docs/Fraudulent%20Transfer/2014_AUVTA_Final%20Act_2016mar8.pdf [https://perma.cc/YV7Y-YWB3]. The amended UVTA does not provide any further guidance on the primary issue in this case—the meaning of "first transferee."

Utah adopts a version of a uniform act but are nevertheless considered relevant when seeking legislative intent."); *Schurtz v. BMW of North Am., Inc.*, 814 P.2d 1108, 1113 (Utah 1991) (stating that "the comments of the drafters of the Uniform Commercial Code" provide "the only thing that could be described as legislative history").

¶22　In apparent recognition of the fact that subsection 8(b) of the Uniform Act was derived from section 550(a) of the Bankruptcy Code, some state courts have relied on the dominion or control tests articulated by the federal circuit courts in interpreting the "first transferee" provision of the Uniform Act. For example, in *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157 (Tex. App. 1996), the Texas Fourteenth Court of Appeals noted that "[n]either the former nor current fraudulent transfer statutes defined a 'transferee.'" *Id.* at 165. Recognizing the similarities between the Uniform Act and the Bankruptcy Code, and that the Fifth Circuit Court of Appeals has "defined a transferee as a party who has legal dominion or control over the funds; that is, the right to put the money to one's own use," the court applied a "dominion or control" test. *Id.* at 165–66 (citing *In re Coutee*, 984 F.2d at 141). The court then concluded that a bank that was "simply complying with its depositors' instructions to pay" a doctor "in accordance with applicable law and prudent banking standards" was not a transferee because the bank "did not exercise 'dominion or control' over the[] funds." *Id.* at 166 (citation omitted).

¶23　In *PHI Financial Services, Inc. v. Johnston Law Office, PC*, 2016 ND 20, 874 N.W.2d 910, a North Dakota case with facts similar to the case before this court, the debtors deposited funds into a law firm's trust account via two transactions. *Id.* ¶ 5. The first check was for the law firm's attorney fees. *Id.* The second check was sent to the law firm with instructions to forward the money to the father of one of the debtors. *Id.* The law firm transferred the requested amount from its trust account to the father and retained the remaining funds for legal fees. *Id.* The debtors' creditors brought suit against the law firm, alleging

theories of conversion and fraudulent transfer. *Id.* ¶ 6. After a bench trial, the district court found that the transfer to the father was fraudulent and that the creditors were entitled to recover the amount of the transfer from the law firm. *Id.* The law firm appealed, arguing that the district court erred in voiding the transfer from its trust account to the father at the direction of the debtors. *Id.* ¶ 11.

¶24 On appeal, the Supreme Court of North Dakota observed that section 8(b) of the Uniform Act was derived from section 550(a) of the Bankruptcy Code and concluded that "the 'mere conduit' cases decided under the Bankruptcy Code [were] helpful in analyzing the issue" in the case. *Id.* ¶ 14. The court noted that it was undisputed that the funds at issue were placed in the law firm's trust account and that pursuant to the North Dakota Rules of Professional Conduct, "[c]lient funds must be held in a trust account to ensure their safekeeping from loss and to maintain ready availability to the client upon termination of the representation" and that "[a]ll property that is the property of clients . . . must be kept separate from the lawyer's business and personal property." *Id.* ¶ 15 (citations and internal quotation marks omitted). The court further observed that "[a] law firm is not free to put monies deposited in a client trust account to its own use." *Id.* Applying the "mere conduit" rule, the court concluded that because the law firm "held this portion of the funds 'only for the purpose of fulfilling an instruction to make the funds available to someone else,'" the father, not the law firm, was the "first transferee" under North Dakota's fraudulent transfer statute. *Id.* ¶ 17 (quoting *In re Coutee*, 984 F.2d at 141). Thus, the supreme court concluded that the district court had erred as a matter of law in holding the law firm liable for the transfer to the father. *Id.*

¶25 We find the reasoning of the federal and state courts applying a dominion or control test to be both persuasive and consistent with the Act's text and history. *See generally Wing v. Harrison*, 2004 WL 966298, at *3–5 (D. Utah Apr. 29, 2004) (observing that "the Bankruptcy Code was the model for the

provision of Utah's Fraudulent Transfer Act that distinguishes between initial and subsequent transferees" and that "[t]he focus of the analysis [under the Act] is whether a party exercised dominion and control over the transferred funds"). We therefore apply the dominion or control test to determine whether Law Firm was the first transferee of the $50,000 under the Act, i.e., we examine whether Law Firm exercised legal dominion and control over the funds.[12] *See id.* We conclude that Law Firm was not the first transferee of the $50,000.

B.      Law Firm was not the first transferee of the $50,000

¶26     In Utah, money belonging to a client or third party must be placed in a trust account. Utah R. Jud. Admin. 14-1001(a) ("A lawyer or law firm shall create and maintain an interest or dividend-bearing account for client funds ('IOLTA account'). *All client funds shall be placed into this account* except those funds which can earn net income for the client in excess of the costs to secure such income . . . ." (emphasis added)). Pursuant to rule 1.15 of the Utah Rules of Professional Conduct, "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property." Utah R. Prof'l Cond. 1.15(a); *id.* R. 1.15 cmt. 1 ("All property which is the property of clients or third persons . . . must be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts."). In addition, "[a] lawyer should hold property of others with the care required of a professional fiduciary." *Id.* R. 1.15 cmt. 1. Simply put, "[a] law firm is not free to put monies deposited in a client trust account to its own use." *PHI Fin. Services*, 2016 ND 20, ¶ 15; *see also, e.g., In re Discipline of Ince*, 957 P.2d 1233, 1234–35, 1239 (Utah 1998) (concluding that a lawyer "must be disbarred" where, among other things, he

---

12. For purposes of this decision, any distinctions which may exist between the dominion test and the control test do not affect our conclusion that Law Firm was not the first transferee.

"misappropriate[ed] law firm and client funds for his own use and benefit").

¶27    Here, it is undisputed that Debtors were Law Firm's clients and that the $50,000 was placed in Law Firm's trust account not its business account, indicating that Law Firm held the $50,000 in a fiduciary capacity for Debtors. Thus, based on Law Firm's ethical obligations with respect to funds placed in its trust account, we conclude that Law Firm did not have the requisite legal dominion (or control) over the $50,000, because Law Firm "had no legal right to put the funds to its own use." *See In re Coutee*, 984 F.2d 138, 141 (5th Cir. 1993). Consequently, Law Firm "lacked the requisite dominion" required to be the first transferee of the funds under subsection 25-6-9(2) of the Act. *See id.* And because Law Firm was not the first transferee of the $50,000, "there was no transfer giving rise to liability" on the part of Law Firm. *See Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 166 (Tex. App. 1996).[13]

¶28    Our conclusion is bolstered by the definition of "transfer" in the Act. Under the Act, a transfer is defined as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[14] Utah Code Ann. § 25-6-2(12) (LexisNexis 2013). Here, Debtors' actions did not effectuate a transfer within the meaning of section 25-6-2(12)—even after the $50,000 was deposited in Law Firm's trust

---

13. Our decision in no way excuses or condones Debtors' deliberate disregard for the 2009 judgment. Nor does our decision free Debtors or Appellees from any potential liability arising under common-law fraud or related legal theories.

14. The Act's definition of "transfer" is substantially similar to the Bankruptcy Code's definition. *Compare* Utah Code Ann. § 25-6-2(12), *with* 11 U.S.C. § 101(54) (2012).

account, Debtors retained their interest in, and legal control of, the $50,000. *See, e.g.*, *Bakwin v. Mardirosian*, 6 N.E.3d 1078, 1089 (Mass. 2014) (concluding that no transfer was made under Massachusetts's version of the Uniform Act where there was no evidence that the debtor "relinquished control of [a savings account], or changed title in the account at any point" and his "right to the proceeds of the . . . savings account never changed"). As such, we are persuaded that the $50,000 was not transferred to Law Firm as that term is defined in the Act.[15]

¶29 Because we have applied the dominion or control test, Creditors urge us to go one step further and "also adopt the *Harwell* test." *See Martinez v. Hutton* (*In re Harwell*), 628 F.3d 1312 (11th Cir. 2010). In *Harwell*, the Eleventh Circuit Court of Appeals clarified that "good faith is a requirement under [the Eleventh] Circuit's mere conduit or control test."[16] *Id.* at 1323 & n.10. *See generally Redmond v. NCMIC Fin. Corp.* (*In re Brooke Corp.*), 568 B.R. 378, 421 (Bankr. D. Kan. 2017) ("*Harwell* is a refinement of the control test."). The court first observed "that a

---

15. We note that Creditors' arguments on appeal only concern the $50,000 deposited into Law Firm's trust account. Although Creditors briefly observe that Law Firm later "paid . . . itself" $2,745 from its trust account to its operating account at Debtors' behest, Creditors do not assert that this action constituted a "transfer" under the Act or that Law Firm was the "first transferee" of the $2,745. Consequently, we need not consider whether the $2,745 transfer (assuming it can be called one) to Law Firm's operating account is voidable under section 25-6-9 of the Act.

16. Appellees correctly observe that "*Harwell* has received almost no attention outside of the Eleventh Circuit, being cited by a handful of . . . Bankruptcy Courts" outside of the Eleventh Circuit. Indeed, our own research indicates that no federal circuit court outside of the Eleventh Circuit has addressed, much less accepted or rejected, the control test as set forth in *Harwell*.

literal or rigid interpretation of the statutory term 'initial transferee' in § 550(a) [of the Bankruptcy Code] means that the first recipient of the debtor's fraudulently-transferred funds is an 'initial transferee.'" *In re Harwell*, 628 F.3d at 1322; *id.* at 1323–24 (noting that the defendant was the initial recipient of the debtor's funds and concluding that he was therefore the initial transferee of the funds under section 550(a)). The court then noted that over time, it had "carved out an equitable exception to the literal statutory language of 'initial transferee,' known as the mere conduit or control test, for initial recipients who are 'mere conduits' with no control over the fraudulently-transferred funds." *Id.* at 1322. The court further explained that "as part of the mere conduit or control test, this Court considers whether the intermediary acts without bad faith, and is simply an innocent participant to the fraudulent transfer." *Id.* at 1323 (citation and internal quotation marks omitted). In sum, under the Eleventh Circuit's mere conduit or control test as articulated in *Harwell*,

> initial recipients of the debtor's fraudulently-transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language must establish (1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer.

*Id. But see id.* at 1324 ("In the vast majority of cases, a client's settlement funds transferred in and out of a lawyer's trust account will be just like bank transfers, and lawyers as intermediaries will be entitled to mere conduit status because they lack control over the funds.").

¶30 We decline to adopt the good faith requirement from *Harwell*. To begin with, Creditors concede that under both the

Act and the Bankruptcy Code, true "initial" or "first" transferees are "not given a good faith exception." Moreover, Creditors spend the majority of their briefing on this issue explaining why "[t]his court should not adopt the conduit and control test," and they maintain that adopting a good-faith test, like that in *Harwell*, "is not consistent with the scheme of the [Act]." Creditors then assert that if we adopt the dominion or control test, as we do, we should also adopt the reasoning from *Harwell*. However, having previously argued only against *Harwell*, Creditors fail to then explain or provide any compelling reason why we should adopt *Harwell* separately. In light of that failure, we conclude that Creditors have not carried their burden of persuasion on appeal on this issue, and we decline to address it further. *See* Utah R. App. P. 24(a)(8).

¶31    In sum, we conclude that Law Firm was not a "first transferee" under the Act, because Law Firm held the $50,000 in its trust account in a fiduciary capacity and did not have legal dominion or control over the funds. Accordingly, the district court did not err in granting Appellees' motion for summary judgment on this issue.

## II.

¶32    Creditors next contend that "[v]iolation of the [Act] may serve as a predicate act to support a claim for civil conspiracy."

¶33    To establish a claim of civil conspiracy, five elements must be shown: "'(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'" *Peterson v. Delta Air Lines, Inc.*, 2002 UT App 56, ¶ 12, 42 P.3d 1253 (quoting *Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993)). "The claim of civil conspiracy require[s], as one of [its] essential elements, an underlying tort." *Puttuck v. Gendron*, 2008 UT App 362, ¶ 21, 199 P.3d 971 (alterations in original) (citation and internal quotation marks omitted). "Thus, in order to sufficiently

plead a claim for civil conspiracy, a plaintiff is obligated to adequately plead the existence of such a tort." *Id.* (citation and internal quotation marks omitted). "Where plaintiffs have not adequately pleaded *any* of the basic torts they allege . . . dismissal of their civil conspiracy claim is appropriate." *Id.* (omission in original) (citation and internal quotation marks omitted).

¶34    Creditors assert that only "[t]wo cases have used the word 'tort,' rather than the term 'one or more unlawful, overt acts.'" (Citing *Puttuck*, 2008 UT App 362, ¶ 21, and *Coroles v. Sabey*, 2003 UT App 339, ¶ 36, 79 P.3d 974.) According to Creditors, even though this distinction has not been developed by Utah courts, "[i]n reality, these words do not describe different predicate acts," and "[c]onspiring to violate the [Act] is a sufficient predicate act to support a claim of civil conspiracy." Appellees contend that "the only underlying conduct alleged to support [Creditors'] conspiracy claim is that [Law Firm] engaged in transfers that violated the [Act]" and that "[t]his alleged conduct is insufficient to support a civil conspiracy claim because it is not a valid tort claim against [Law Firm]." Alternatively, Appellees assert that because "[Law Firm] is not a transferee under the [Act], . . . the fraudulent conveyance claims against [Law Firm] fail as a matter of law"; therefore, "Creditors have failed as a matter of law to state any valid underlying claim as to [Law Firm] upon which to predicate their civil conspiracy claim." We agree with Appellees' alternative argument.

¶35    Creditors' conspiracy claim is predicated on the existence of a fraudulent transfer of the $50,000 from Debtors to Law Firm. In the civil conspiracy section of their complaint, Creditors alleged that Debtors and Appellees "conspired with each other to carry out the means to effectuate a fraudulent transfer" and that "[t]he transfer of the $50,000 to [Law Firm] was in violation of the [Act]." Even assuming, without deciding, that there is no requirement for an underlying "tort" to establish a claim for civil conspiracy and that a violation of the Act could serve as the unlawful, overt act necessary to support a civil conspiracy claim,

Creditors have not established that a violation of the Act occurred in this case.[17] *See generally National Loan Inv'rs, LP v. Givens*, 952 P.2d 1067, 1070 (Utah 1998) ("To state a claim for relief [under the Act], a plaintiff must allege that he or she is a creditor who has a right to payment from the defendant and that the defendant has made transfers of property or incurred obligations that meet the criteria of sections 25-5-5 and -6."). As previously discussed, there was no transfer of legal dominion or control of the $50,000 from Debtors to Law Firm, and thus Law Firm was not the first transferee of the funds. As such, Creditors' fraudulent transfer claims against Law Firm fail and cannot serve as the basis for Creditors' civil conspiracy claim as they describe it. *See generally GATX Corp. v. Addington*, 879 F. Supp. 2d 633, 650 (E.D. Ky. 2012) (concluding that "even if Kentucky recognized a claim of conspiring to effect a fraudulent conveyance," "a nontransferee cannot be directly liable for a fraudulent conveyance and, thus, cannot engage in [the] underlying unlawful act" necessary to support a claim of civil conspiracy).

¶36  In the same section of their complaint, Creditors also alleged that Debtors' "failure to disclose the $50,000 when asked about their assets during the supplemental hearing, the transfer of the $50,000 to [Law Firm], and the subsequent transfer of the $50,000 from [Law Firm] to itself and various other third parties were all unlawful, overt acts." However, the complaint does not specify how those acts were "unlawful." Creditors did not specifically allege that Law Firm's "subsequent transfer" of a portion of the $50,000 from its trust account to its operating account constituted a violation of the Act or that Law Firm's "subsequent transfer[s]" to itself and other third parties constituted, for example, conspiracy to commit common-law fraud. *See generally* Utah R. Civ. P. 9(c) ("In alleging fraud . . . , a party must state with particularity the circumstances

_____

17. Creditors did not assert any common-law fraud or aiding and abetting claims.

constituting fraud . . . .”). Moreover, as we previously observed, *supra* note 15, on appeal, Creditors only briefly mention the fact that Law Firm ultimately paid itself $2,745 from the $50,000, and Creditors do not assert that this action constituted a “transfer” under the Act or that Law Firm was the “first transferee” of the $2,745.

¶37 Accordingly, we agree with Appellees that Creditors have failed “to state any valid underlying claim as to [Law Firm] upon which to predicate their civil conspiracy claim.” We therefore conclude that the district court did not err in granting Appellees’ motion for summary judgment on Creditors’ civil conspiracy claim.

CONCLUSION

¶38 The district court did not err in granting Appellees’ motions for summary judgment. Law Firm was not the first transferee of the $50,000, because it lacked the requisite legal dominion or control required to be the first transferee of the money. In addition, because Creditors have not established that a violation of the Act occurred as between Debtors and Law Firm regarding the $50,000, Creditors’ civil conspiracy claim must fail. We affirm the judgment of the district court.

———————